# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black; padding:1em;">

### *In re Ay. D.*, 2020 IL App (3d) 200056

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* Ay. D. and Ar. D., Minors (The People of the State of Illinois, Petitioner-Appellee, v. William D. and Perrisha E., Respondents-Appellants). |
| District & No. | Third District<br>No. 3-20-0056 |
| Filed | July 2, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Will County, Nos. 16-JA-118, 17-JA-115; the Hon. Timothy J. Cusack and the Hon. Paula Gomora, Judges, presiding. |
| Judgment | Affirmed in part and dismissed in part. |
| Counsel on Appeal | Kristen Messamore, of Hammel Law Offices, P.C., of Joliet, for appellant William D.<br><br>Daniel J. Kallan, of Joliet, for other appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino and Thomas D. Arado, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Neil J. Adams, of Joliet, for other appellees. |

Panel                     JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice Schmidt concurred in the judgment and opinion.
Presiding Justice Lytton specially concurred, with opinion.

## OPINION

¶ 1     The respondents, William D. and Perrisha E., appeal following the trial court's determination that they were unfit to parent their minor children Ar. D. (born May 2017) and Ay. D. (born June 2016) and that the minors' best interest favored terminating their parental rights.

¶ 2                         I. BACKGROUND

¶ 3     In October 2016, the State filed a petition of neglect and abuse as to Ay. D., who was four months old at the time. The State alleged that Ay. D. was (1) neglected in that her environment was injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2016)) and (2) abused in that her parent inflicted, caused to be inflicted, or allowed to be inflicted upon her physical injury, other than by accidental means (705 ILCS 405/2-3(2)(i) (West 2016)). The case came to the attention of the Department of Children and Family Services (DCFS) when Ay. D. was treated for a broken arm and skull fracture while in William's care, and his explanation of the injuries was unsatisfactory. Perrisha was not present when the incident occurred. DCFS opened an intact family case, and William was ordered not to reside in the family home. Ar. D. was born in May 2017. Perrisha completed the recommended services, and the case was closed in July 2017.

¶ 4     In September 2017, the State filed a supplemental petition as to Ay. D. and its first petition as to four-month-old Ar. D., alleging that they were neglected in that their environment was injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2016)). The parties stipulated that Ay. D.'s injuries in October 2016 occurred while in William's care. The case came to the attention of DCFS for a second time when Ar. D. suffered numerous fractures (femur, skull, and ribs) when Perrisha left Ar. D. with a family member and William had access to the family home. The State charged William with aggravated battery to a child for Ar. D.'s injuries. The trial court found probable cause to believe that the minors were neglected, placed temporary custody with DCFS, ordered that William have no contact with the minors and Perrisha, ordered William and Perrisha to cooperate with DCFS, and suspended William's visitation.

¶ 5     A January 2018 status report from a caseworker at One Hope United, an agency of DCFS, stated that Perrisha visited the minors bi-weekly with her mother and that she depended on support from her family to assist her with transportation. The visits usually went well, and the children appeared to enjoy their interaction with their mother. The caseworker referred Perrisha for an assessment and individual and group therapy for victim services, a substance abuse assessment, and parenting classes. Perrisha was directed to follow any recommendations from the substance abuse assessment. The caseworker noted that Perrisha appeared to be working towards reunification services and her progress would be assessed in two months. The report also noted that a caseworker visited William while he was in the custody of the Will County Detention Center. William informed the caseworker that he was engaging in substance abuse treatment and parenting classes. The caseworker recommended that William participate in the

anger management program when offered through the correctional facility. Overall, the caseworker recommended a goal of returning home within 12 months and stated that the agency would continue to monitor the minors in placement and assess the needs of the family.

¶ 6        In January 2018, the trial court held an adjudicatory hearing. Patrice Rounsaville testified that she was employed as an investigator for DCFS. She stated that she had indicated William for Ar. D.'s leg fracture. At the time of Rounsaville's investigation, she learned that Ar. D. had a femur fracture and some older injuries to her skull, ribs, and abdominal area that appeared to be healing. She stated that medical professionals indicated that these injuries were nonaccidental. Rounsaville also testified that she indicated Perrisha for inadequate supervision because she left Ar. D. in the care of her sister, Ashley, and William was present. She said that this was problematic because Perrisha was aware that William was not supposed to be unsupervised with the minors. Rounsaville also stated that she learned in the course of her investigation that (1) Ashley had her own children removed by DCFS and (2) William admitted to the police that he caused the bone fractures to the minors. Rounsaville testified that there were several individuals, identified as relatives and visitors, in the home upon her arrival. She noted the living conditions were "not the best." Rounsaville noticed that the home had a slight odor, the kitchen ceiling appeared to be sinking in, roaches were in the home, and there was an inadequate food supply in the refrigerator and cabinets.

¶ 7        David Jackson, a detective with the Joliet Police Department, also testified. He stated that he interviewed William following a call he received from the hospital that a child was in the emergency room with a broken leg. He later learned that the child had a broken femur bone, which he stated was the hardest bone in the body. Jackson said that William claimed he was babysitting Ar. D. when he picked her up, locked her knee, and broke her leg. He also asked William about Ay. D.'s injuries from 2016. William stated that Ay. D.'s arm was out of the socket, and he attempted to put it back, but he put too much pressure on her arm and broke it. Jackson also interviewed Perrisha and stated that she did not admit to causing the injuries to the minors. He also noted that Perrisha reported William in the past for domestic battery, but did not follow through. The trial court found the minors to be neglected and again admonished William and Perrisha to follow DCFS's service plans.

¶ 8        A February 2018 status report from the caseworker at One Hope United indicated that Perrisha visited the minors consistently with her mother without incident. The caseworker stated, that although family contact was encouraged, it was necessary for Perrisha to participate in visitation without any person involved so that the caseworker could assess her parenting and interaction with the minors. Perrisha adhered to the recommendation and participated and cared for the minors on her own during her last few visits. She appropriately interacted with the minors and provided them with food during visits. The report also noted that Perrisha tended to the minors' immediate needs during these visits. She successfully completed a substance abuse assessment without any further recommendations for services, provided random urine screens with negative results, and initiated domestic violence victim services. Perrisha reportedly completed a parenting class as part of her first case in 2017, but the caseworker was waiting to receive the documentation.

¶ 9        The report also stated that a caseworker visited William in jail. William did not provide any new information and did not admit to causing the minors' injuries, despite his prior admission. However, William did inform the caseworker that he participated in substance abuse treatment and parenting classes since the case was reopened in September 2017.

Meanwhile, the minors resided with their paternal aunt in Joliet. It appeared that she cared for the minors adequately without any immediate concerns to be addressed. The minors appeared to be doing well and happy, attended daycare services during the day while their aunt worked, and continued to receive appropriate medical care. The caseworker recommended that (1) Perrisha continue to engage in services toward reunification with the minors, (2) Perrisha continue to maintain contact with the agency and keep her information up to date, (3) Perrisha continue to adhere to requests for random urine screens, (4) William continue to participate in case planning with the agency, (5) William provide any documentation for services he reported that he completed, and (6) DCFS continue monitoring the minor children in placement and assess their progress.

¶ 10    In February 2018, the trial court held a dispositional hearing. The court found that it was in the best interest of the minors that they be made wards of the court. The court also found that services aimed at family preservation and family reunification were unsuccessful in rectifying the conditions that led to a finding of unfitness to care for, protect, train, or discipline the minors. As to Perrisha, the court found that she had yet to complete all of the services outlined in her service plan, such as participating in domestic violence counseling, providing supporting documentation of completed services, and signing releases for the agency to obtain this information. As to William, the court found that he was incarcerated as a result of charges that were brought against him for Ar. D.'s injuries. Also, the court stated he needed to complete anger management services, as outlined by his service plan, and sign releases to the agency for it to obtain information with regard to services. As a result, the court found William and Perrisha unfit. The court did not admonish them of their appeal rights, and no appeal followed. A few days later, the caseworker prepared an additional service plan for Perrisha. In addition to domestic violence counseling, the agency recommended parenting coaching and a psychological assessment.

¶ 11    In April 2018, a report from the Court Appointed Special Advocates (CASA) stated that the minors continued to reside with their paternal aunt, their environment was well maintained, and they appeared happy and well taken care of. Perrisha continued her visitation, though she frequently brought another family member with her to attend visits. She was attentive to the minors' needs and did not need prompting for "play" interaction. However, when Perrisha attended visits alone, she seemed very overwhelmed. Perrisha reported that she completed her domestic violence counseling, but she had not signed a release to allow CASA to verify her progress. The caseworker recommended that a parenting coach be added to visitation, that the minors remain in their placement, and that Perrisha provide documentation of completion of domestic violence services.

¶ 12    A number of permanency review hearings followed. In June 2018, the trial court's written order found that Perrisha had made substantial progress toward the goal of returning home within a period not to exceed one year and that William had not made reasonable efforts or reasonable progress toward the goal. In October 2018, an order following a permanency review hearing indicated the same. Around early 2019, the minors were placed in a traditional foster home.

¶ 13    In June 2019, an order following a permanency review hearing found that Perrisha had not made reasonable progress and that William had not made either reasonable progress or reasonable efforts toward the goal. The State's petition to terminate Perrisha and William's parental rights followed. The State alleged that Perrisha and William remained unfit and failed

to make reasonable progress toward the return of the minors within nine months after an adjudication of neglect or abuse. The State specifically cited the nine-month periods of January 18, 2018, through October 18, 2018, and October 19, 2018, through July 19, 2019. Also, the State alleged it was in the best interest of the minors to terminate the parental rights and grant custody and guardianship to DCFS.

¶ 14    In July 2019, the trial court changed the goal from returning home in 12 months to substitute care pending the court's determination on the State's petition to terminate parental rights.

¶ 15    In October 2019, CASA filed a report with the trial court. The report stated that Perrisha had given birth to a third child, who was taken into protective custody and placed with Ar. D. and Ay. D. The report also stated that CASA remained concerned with Perrisha's decision-making skills in regard to protecting her children. Additionally, Perrisha's boyfriend, and father of her third child, had an extensive criminal history. He was previously convicted of criminal sexual assault of a minor and was a registered sex offender. Perrisha continued her relationship with him, despite knowing this information. The report also stated that CASA met with Perrisha to ensure a safety plan was in place for her to not have her boyfriend around Ar. D. and Ay. D. William remained in prison. The report recommended the minors remain in their current placement and the case progress toward the termination of parental rights.

¶ 16    In December 2019, the trial court held a hearing on the State's petition to terminate parental rights. Before the hearing commenced, the court granted the State leave to file an amended petition to terminate parental rights, which added an allegation that William was unfit in that he was depraved and claimed a presumption existed that he was depraved because he was convicted of aggravated battery to a child (Will County case No. 17-CF-1931). The State tendered a certified copy of William's conviction for which he was sentenced to seven years and six months' imprisonment.

¶ 17    Rebecca Martino, a licensed clinical professional counselor and parent coach, testified. Neither party objected to her qualification as an expert in counseling. She testified that she was Perrisha's counselor and conducted a mental health assessment in July 2018. During the assessment, Perrisha did not indicate that she understood the severity of her DCFS case. Martino determined that Perrisha needed individual therapy and domestic violence counseling. Also, she stated that Perrisha needed to work on communication and relationship skills.

¶ 18    Martino worked with Perrisha individually for five weeks, then transitioned into parenting coaching from October 2018 to May 2019, until Martino discharged Perrisha for not making enough progress. Martino noted that Perrisha's attitude became poor, she had a new boyfriend and allowed him to participate in parenting coaching while unaware of his background, and she had become pregnant. She believed that Perrisha harbored anger at DCFS and One Hope United. Martino also stated that Perrisha would sometimes be on her phone during sessions, would not respond to her, would not look at her, and would not answer her questions. Martino had to remind Perrisha to engage with the minors and advise her to watch the minors as they were of an age where they were mobile and getting into things. She had to continuously intervene by prompting Perrisha to make eye contact and engage with the minors; however, "it never really clicked" with Perrisha. Martino also had to prompt Perrisha to change the minors' diapers.

¶ 19    Martino also stated that Perrisha did not do well with awareness of her home environment and potential safety issues. When she arrived at Perrisha's home on one occasion, the home

had no heat, and the session had to be cancelled. Additionally, the home remained in a messy state, and there were broken pencils and uncovered outlets. Martino noted that Perrisha made progress in the areas of nutrition and attendance only. She also noted that Perrisha characterized William's harm as twisting Ay. D.'s arm or leg, then he did the same to Ar. D. Perrisha acknowledged that she left Ar. D. in William's care after the first incident, she did not believe William caused the injury, and she was not present for the incident. Nonetheless, Martino noted that Perrisha made some progress in domestic violence counseling, and there was also some improvement in parenting skills.

¶ 20     Next, Bryon Newton, a caseworker employed by One Hope United, testified. He stated that he was the caseworker for the minors, Perrisha, and William since November 2017. Newton said that the basis for the family needing services was because both girls sustained fractures, which William admitted having caused. He stated that William was in custody the entire time he oversaw the case, and he was aware that William pled guilty to aggravated battery. Newton never received any proof that William completed recommended services. However, on cross-examination, William's counsel tendered documentation demonstrating William's completion of a parenting lesson workbook from March 2019 and a three-hour anger management course in November 2018.

¶ 21     Newton stated that Perrisha was cooperative with counseling, but unable to parent independently. He noted that she never resided anywhere independently, and there were occasions where he needed other family members present to help him explain his advice to her. Newton said that he questioned whether Perrisha understood what was being taught in domestic violence counseling, as she had become involved with a man with a dubious history; specifically, he was a convicted sex offender. However, Newton reported that Perrisha completed individual therapy, parenting classes, domestic violence victim counseling, and some parenting coaching until it was terminated. Newton stated her visitation was consistent, and she learned to feed her children healthier foods. Following Newton's testimony, the cause was continued to February 2020.

¶ 22     In February 2020, Dr. Nicholas O'Riordan, a clinical psychologist, testified at the hearing on the State's petition to terminate parental rights. The parties stipulated that he was qualified to testify about his testing results, his opinions derived from those results, and his clinical examination. Dr. O'Riordan testified that DCFS requested that Perrisha undergo a psychological evaluation to determine if she was capable of parenting her children. He met with Perrisha and administered a standardized and cognitive functioning test. Dr. O'Riordan concluded that Perrisha (1) did not have a cognitive deficiency, but was a slow learner, (2) had difficulty drawing conclusions, and (3) did not anticipate problems. He noted that Perrisha could not look back to determine what she could have done differently. Dr. O'Riordan learned from Perrisha that there was a history of domestic violence with William, but that she "took it back to some extent." He also testified that, at the time of the evaluation, he was concerned that the children would be at a risk for neglect and abuse if they were returned to her care in the immediate future.

¶ 23     Dr. O'Riordan also expressed concern over Perrisha's ability to function as an independent adult. He stated that she greatly depended on her family for emotional support and that she did not take any responsibility for her actions. Further, there was no indication that she could live on her own. Dr. O'Riordan characterized Perrisha as immature, naïve, and dependent. Additionally, he believed that she functioned at a third or fourth grade level. He believed that

she would likely be the victim of aggressive men. Dr. O'Riordan said these observations confirmed his opinion that there were significant obstacles for Perrisha to become a good parent.

¶ 24       Kaitlin Nolan, a CASA advocate supervisor and guardian *ad litem*, testified. She stated that both minors sustained fractures while in William's care. Nolan noted that Perrisha left the minors in William's care after the first instance of injury and had concerns regarding whether Perrisha understood the danger the minors faced while in his care. She also learned that Perrisha's new boyfriend was a convicted sex offender, which also caused her concern. Nolan's predominant concern was Perrisha's ability to make good decisions as she believed Perrisha did not exercise good judgment.

¶ 25       Perrisha testified that she worked on the required services in an effort to get her children back. She stated that she completed a psychological evaluation with Dr. O'Riordan and visited her children regularly. Perrisha stated that she benefitted from parenting coaching. Also, she learned about good nutrition for the minors, started to read to the minors, and learned about abusive relationships and warning signs. Perrisha maintained that her new boyfriend was not abusive, but admitted that he was convicted of a felony for the criminal sexual assault of a young girl. She said that she wanted her children back, and her family would help her raise them. At the time of the hearing, she was employed and lived with her older brother and sister in Joliet.

¶ 26       Last, William testified. He stated that he was incarcerated at Pinckneyville Correctional Center. He identified two documents demonstrating that he completed a parenting workbook and an anger management course while detained in the Will County Adult Detention Facility. He said that he was signed up for more services in prison as he was "thinking of a change and fatherhood." He testified that such services would also address the topic of parenting. The parties stipulated that William's projected discharge date from prison was February 5, 2024, and that he would be placed on mandatory supervised release for three years, until February 5, 2027.

¶ 27       The trial court found that Perrisha failed to make reasonable progress during the relevant time periods as explained by Dr. O'Riordan and Martino. The court noted that Perrisha engaged in services, but was hindered by her own cognitive limitations. For example, she left Ar. D. in William's unsupervised care, knowing that he previously abused Ay. D., which demonstrated that she was unable to comprehend the risk. Also, her dependence on others was demonstrated by her relationship with a convicted sex offender, despite DCFS's warning that the minors would not be returned to her care if she continued that relationship. The court noted that Perrisha's relationship with her boyfriend was further complicated by the fact that they now have a child together and that the minors cannot be around him by virtue of his own conviction.

¶ 28       As to William, the trial court found that he was depraved in that he was convicted of aggravated battery to a child and that presumption was not overcome by the introduction of his three hours of anger management education and completion of a parenting workbook, as they were insufficient to demonstrate the restoration of his morality. The court also found that William failed to make reasonable progress during the relevant time frames. The court noted that William will be in custody until 2024, and he failed to complete services, as indicated by Newton.

¶ 29    The following day, the trial court proceeded to the best interest hearing. Newton again testified. He stated that the minors were placed in traditional foster care together and had been there for over a year. He stated that Ay. D. had some developmental issues, but that Ar. D. did not have any special needs. Ay. D.'s special needs were being met through occupational therapy at her daycare. At the time of the hearing, Ay. D. was three years old, Ar. D. was two years old, and Newton had observed them in their placement. The foster home had other children that were 9, 10, and 11 years old. He stated that the home was a safe and nurturing environment, that the minors appeared to have a bonded relationship with the foster mother, and that the minors called the foster mother "mom." The foster mother expressed an interest in adopting the minors, and he had no problems with that goal. Newton stated that the placement was fit and proper. He also acknowledged that the minors have a bond with Perrisha, and Perrisha appears to love them.

¶ 30    Denise Beran, the program director for CASA, testified that CASA believed the foster placement was fit and proper and that it was in the minors' best interest to be adopted by the foster parents. Beran also acknowledged that there was a bond between Perrisha and the minors and that the minors loved Perrisha. Beran's testimony largely reiterated Newton's testimony. Following this testimony, the trial court found that it was in the best interest of the minors that Perrisha and William's parental rights be terminated. These appeals followed.

¶ 31    Both Perrisha and William have appealed the trial court's decision with respect to both minors, which resulted in four different appeals: Appeal Nos. 3-20-0056 (Ay. D. as to Perrisha), 3-20-0074 (Ay. D. as to William), 3-20-0058 (Ar. D. as to Perrisha), and 3-20-0075 (Ar. D. as to William). We have consolidated and docketed these appeals solely as No. 3-20-0056.

¶ 32                                   II. ANALYSIS

¶ 33    On appeal, Perrisha and William both argue that the trial court erred when it (1) allowed inadmissible hearsay at the January 2018 adjudicatory hearing and (2) failed to advise them of their appeal rights following a finding of unfitness at the February 2018 dispositional hearing. Perrisha, alone, argues that (1) the State did not prove her unfit by clear and convincing evidence and (2) the best interest of the minors did not favor termination of her parental rights.

¶ 34                          A. The Adjudicatory Hearing

¶ 35    In January 2018, the trial court held an adjudicatory hearing on the neglect petitions. The court heard testimony from DCFS Investigator Rounsaville and Detective Jackson. Perrisha and William argue that the witnesses' testimonies contained inadmissible hearsay, and those statements provided the factual basis for the court's decision. They acknowledge that they did not object to this testimony and are raising these issues for the first time on appeal. Nonetheless, they ask for plain error review. The State argues this court does not have jurisdiction to consider arguments related to the January 2018 adjudicatory hearing because (1) no notice of appeal was filed until February 2020, following a finding of unfitness and the termination of their parental rights and (2) the notices of appeal only listed the judgment date of February 4, 2020.

¶ 36    We first must address whether we have jurisdiction, which we review *de novo*. *In re Custody of C.C.*, 2013 IL App (3d) 120342, ¶ 51. Specifically, the issue is whether this court

has jurisdiction to review the propriety of a January 2018 adjudicatory order, following an appeal from a finding of unfitness and termination of parental rights in February 2020.

¶ 37 "[A]n adjudicatory order is a step in the procedural progression leading to the dispositional order." *In re D.R.*, 354 Ill. App. 3d 468, 473 (2004). At an adjudicatory hearing, the court decides whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-21(1) (West 2018). The dispositional order that follows determines the placement of the minor. *D.R.*, 354 Ill. App. 3d at 473. An adjudicatory order is not a final and appealable order.[1] *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). Instead, the dispositional order is the final order from which an appeal properly lies. *Id.* Appeals from final orders under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)), other than those involving the delinquency of minors, are governed by the rules applicable to civil cases. Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001). To perfect an appeal in a civil case, a party must file a notice of appeal within 30 days after the entry of a final order, unless an extension of the 30-day limitation is granted. Ill. S. Ct. R. 303(a), (d) (eff. July 1, 2017).

¶ 38 Here, Perrisha and William's notices of appeal were filed in February 2020, following the trial court's finding of unfitness and the termination of their parental rights. No extension was requested pursuant to Rule 303(d). To challenge the validity of the court's January 2018 adjudicatory order, they were required to file their notice of appeal within 30 days of the court's February 2018 dispositional order. See *M.J.*, 314 Ill. App. 3d at 655 (an adjudicatory order is not final and appealable and any issues with that order must be raised following the entry of the dispositional order that follows); see also *In re S.P.*, 2019 IL App (3d) 180476, ¶ 47 ("the dispositional order is a final and appealable order and the proper vehicle to appeal a[n] adjudication of abuse or neglect"). No appeal was filed. Thus, we do not have jurisdiction to address the validity of the adjudicatory order. See *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 50 (finding the court lacked jurisdiction to review the propriety of the adjudication and dispositional orders following an appeal from the termination of parental rights because a timely appeal was not filed from those orders).

¶ 39 Nonetheless, Perrisha and William argue that we have jurisdiction over the adjudicatory order as this court did in *In re G.V.*, 2018 IL App (3d) 180272. In *G.V.*, the parents of the minor appealed following the trial court's May 2018 order finding that they were unfit and the best interest of the minor favored termination of their parental rights. *Id.* ¶¶ 21-22. Among other things, the mother argued that the court erroneously admitted inadmissible hearsay (a DCFS investigatory report) during the May 2016 adjudicatory hearing. *Id.* ¶ 25. For various reasons, the court found the admission of the investigatory report did not comply with the Act and deprived the parents of due process. *Id.* ¶ 34. Accordingly, the court vacated all orders as to both parents entered on and after the date of the adjudicatory hearing (May 4, 2016) and

---

[1]An exception technically lies in Illinois Supreme Court Rule 662(a) (eff. Oct. 1, 1975); however, we fail to see how it could ever be utilized. The exception contained in Rule 662(a) renders an adjudicatory order final and appealable if "an order of disposition has not been entered within 90 days of the adjudication of wardship." *Id.* Rule 662(a) has received criticism because it has not been updated to align with the Act. See *In re Barion S.*, 2012 IL App (1st) 113026, ¶¶ 37-39. Specifically, the Act was amended in 1984 to provide that the adjudication of wardship occurs at the dispositional hearing— not the adjudication hearing. 705 ILCS 405/2-22(1) (West 2018). "Thus, an appeal under Rule 662(a) would never be filed because the adjudication of wardship would not occur before a disposition hearing." *Barion S.*, 2012 IL App (1st) 113026, ¶ 39.

remanded for new proceedings. *Id.* The father in *G.V.* also argued that the court erred in finding him unfit, following a July 2016 dispositional hearing, and that he was never admonished of his appeal rights. *Id.* ¶¶ 35-37. However, the court declined to address the court's dispositional finding, stating that the July 2016 dispositional order was final and appealable, which he failed to timely appeal. *Id.* ¶ 37. Nonetheless, the court held that, even if the father had been properly admonished, an appeal would not have altered the court's finding of unfitness. *Id.*

¶ 40　　The parties in the case at bar rightfully disagree over the application of *G.V.* We note that the parents in *G.V.* appealed from the 2018 best interest determination and the termination of their parental rights. The issues they raised attacked the court's May 2016 adjudicatory order and July 2016 dispositional order. Specifically, on the issue of jurisdiction, the *G.V.* court (1) did not address its jurisdiction over the May 2016 adjudicatory order, but nonetheless reversed that order and all subsequent orders due to the improper admission of the investigatory report at the adjudicatory hearing, and (2) found that it lacked jurisdiction over the July 2016 dispositional order because the father failed to appeal that decision within 30 days.

¶ 41　　We explicitly depart from this court's decision in *G.V.* as it relates to jurisdiction. First, based on our previous explanation, the *G.V.* court did not have jurisdiction to address the May 2016 adjudicatory order following an appeal from the court's May 2018 order terminating parental rights. The court never discussed its jurisdiction over that order, and we decline to speculate because a clear reading of the law dictates that it did not have such jurisdiction. *Supra* ¶ 37. Furthermore, the *G.V.* decision contains a glaring contradiction: how would the court have jurisdiction over the May 2016 adjudicatory order but not the July 2016 dispositional order? See *M.J.*, 314 Ill. App. 3d at 655 (the dispositional order is the final order from which an appeal properly lies). Last, we find it perplexing that the court declined to address the father's argument pertaining to the July 2016 dispositional order on the basis of jurisdiction, when it had already vacated that order when it found that the investigatory report was improperly admitted. See *In re G.V.*, 2018 IL App (3d), 180272 ¶ 34 ("[t]he proper remedy is to vacate all orders entered on and after the May 4, 2016, adjudicatory hearing and begin anew with the wardship proceedings"). Thus, *G.V.* was wrongly decided.

¶ 42　　For the foregoing reasons, we dismiss the portions of Perrisha and William's appeal as it pertains to the propriety of the January 2018 adjudicatory order for lack of jurisdiction. Based on this finding, we need not address the State's argument as it relates to the judgment date listed in the notices of appeal.

¶ 43　　　　　　　　　　　B. Right to Appeal the Dispositional Order

¶ 44　　Perrisha and William argue that the court failed to admonish them of their appeal rights following the entry of the February 2018 dispositional order, thereby violating their right to due process. Again, Perrisha and William acknowledge that they did not raise this issue before the trial court and request that we review the issue for plain error. The State concedes that the court failed to provide the required admonishments (see 705 ILCS 405/1-5(3) (West 2018)) but argues that due process does not require that this court vacate any of the subsequent proceedings.

¶ 45　　We first address whether we have jurisdiction. We have already decided that we do not have jurisdiction to review the *validity* of the 2018 adjudication and dispositional orders in this case due to Perrisha and William's failure to file a timely appeal. However, here, they do not raise an issue pertaining to the *validity* of the dispositional order. Instead, they argue that all

proceedings subsequent to the dispositional order, including the termination of their parental rights, should be vacated and the case remanded for new proceedings due to the court's failure to admonish them of their appeal rights. This appeal followed the termination of their parental rights, which was timely filed (the order terminating parental rights was entered on February 4, 2020, and notices of appeal followed on February 4, 2020, and February 5, 2020). See Ill. S. Ct. R. 303 (eff. July 1, 2017). Therefore, we have jurisdiction to address this issue. See *Z.M.*, 2019 IL App (3d) 180424, ¶ 50.

¶ 46    The fourteenth amendment of the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const., amend. XIV, § 1. The due process clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." (Internal quotation marks omitted.) *In re M.H.*, 196 Ill. 2d 356, 362 (2001). Among the liberty interests protected by the due process clause is a parent's fundamental right in the care, custody, and control of his or her children. *Id.* at 362-63. However, that right is subject to termination. *In re Andrea F.*, 208 Ill. 2d 148, 165 (2003). "Due process in the context of interference with parental rights is achieved by compliance with the provisions of the [Act] and fundamental fairness." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23. Claims of due process violations present questions of law, which we review *de novo*. *In re A.M.*, 402 Ill. App. 3d 720, 723 (2010).

¶ 47    The United States Supreme Court identified three factors to be considered when determining what due process safeguards require in proceedings that implicate fundamental liberty interests: (1) the private interest implicated by the official action; (2) the risk of an erroneous deprivation of that interest through the proceedings used, and the probable value, if any, of additional or substitute safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Our supreme court has applied these factors, referred to as the *Mathews* factors, in cases involving the termination of parental rights. See *M.H.*, 196 Ill. 2d at 363-64; see also *Andrea F.*, 208 Ill. 2d at 165.

¶ 48    Our application of the *Mathews* factors to the case at bar demonstrates that due process does not require this court to vacate the proceedings following the dispositional hearing. First, the private interest at stake is Perrisha and William's interest in the control, custody, and care of Ay. D. and Ar. D. We recognize that this is a fundamental right that will not be terminated lightly. *Z.M.*, 2019 IL App (3d) 180424, ¶ 51.

¶ 49    Second, the trial court's failure to admonish Perrisha and William of their appeal rights, following the entry of the dispositional order, "increased the risk of an erroneous deprivation of [their] rights, which implicates the perceptions of judicial fairness and the integrity of the judicial proceedings." *Id.* Nevertheless, we find that there would be little value in vacating the proceedings that followed the dispositional hearing as a substitute safeguard because there is no indication that Perrisha and William would have appealed following the entry of the dispositional order or that they could raise any meritorious issue on appeal. Arguably, they would have claimed that inadmissible hearsay was admitted during the adjudicatory hearing, as they argued in the first issue where we found we lacked jurisdiction. As to Rounsaville's testimony, Perrisha and William point to her statements that (1) Ar. D. had a femur fracture and some old, healing injuries located on her skull, rib, and abdominal area; (2) medical professionals indicated that the injuries were nonaccidental; (3) Perrisha and William were indicated on an earlier DCFS investigation based on fractures to Ay. D. caused by William;

- 11 -

(4) Perrisha learned that William admitted to the police that he caused bone fractures to the minors; and (5) Ashley, Perrisha's sister, had her own children removed by DCFS. As to Jackson's testimony, they take issue with his statement that he learned that a child's femur bone was fractured. William separately argues that his admission to the police, which Jackson discussed during his testimony, should not have been relied on without corroborating evidence, such as medical records and photographs of Ar. D.

¶ 50    We find that, even if the admission of these statements was erroneous, there was enough other evidence to support the court's neglect finding. See *D.R.*, 354 Ill. App. 3d at 474 (a parent neglects his or her child when the parent's conduct demonstrates a failure to exercise the care that circumstances justly demand and also encompasses both willful and unintentional disregard of parental duty). For instance, Rounsaville stated that Perrisha left Ar. D. in the care of a relative, but that William was also present, even though Perrisha knew that William was not supposed to be unsupervised with the minors because of the previous injury Ay. D. sustained in William's care. Rounsaville also testified that she had concerns over the minors' living conditions based on the number of people in the residence, an odor in the home, the kitchen ceiling appearing to be sinking or falling in, the presence of roaches, and the inadequacy of the food supply in the cabinets and refrigerator. Thus, an appeal following the dispositional order would not have been meritorious.

¶ 51    Third, we consider the governmental interest. Vacating nearly two years of proceedings following the dispositional order would be unduly burdensome on the State's interest of preserving and promoting the minors' welfare and reducing the cost and burden of the termination proceedings. See *M.H.* 196 Ill. 2d at 367; see also *In re A.M.*, 402 Ill. App. 3d 720, 725 (2010) (delays in termination of parental rights proceedings impose a serious cost on governmental function and intangible costs to the lives of the children involved).

Accordingly, our review of the *Mathews* factors demonstrates that due process does not require this court to vacate the proceedings that followed the entry of the dispositional order in this case.

¶ 52    Next, we address the issues that only Perrisha raises on appeal, pertaining to the trial court's fitness finding and best interest determination. We address each of these contentions in turn.

¶ 53                                    C. Fitness Finding
¶ 54    The involuntary termination of parental rights is a two-step process. See 705 ILCS 405/2-29(2) (West 2018). First, the State must prove by clear and convincing evidence that the parent is "unfit" as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Second, if the court finds that a parent is "unfit" within the meaning of section 1(D) of the Adoption Act, the court must then determine whether the child's best interest favors terminating parental rights. *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010).

¶ 55    A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 22. A reviewing court will not reverse a trial court's finding of parental unfitness unless it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence when an opposite conclusion is clearly apparent. *In re A.W.*, 231 Ill. 2d 92, 102 (2008).

¶ 56    Here, the trial court found Perrisha unfit to parent the minors because she failed to make reasonable progress toward the return of the minors within nine months (January 18, 2018, through October 18, 2018, and October 19, 2018, through July 19, 2019) after the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2018). Reasonable progress is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court directives, in light of the condition that gave rise to the removal of the child and other conditions that later become known that would prevent the court from returning custody of the child to the parent. *C.N.*, 196 Ill. 2d at 216-17. Failure to make reasonable progress toward the return of the minor includes the parent's failure to substantially fulfill his or her obligations under the service plan and failure to correct the conditions that brought the child into care. *Id.* at 217.

¶ 57    Here, the State presented sufficient evidence that Perrisha failed to make reasonable progress toward the return of the minors. Aside from her failure to complete the required services, the evidence demonstrated that she was unable to parent the minors independently and continuously failed to appreciate risks. Martino testified that Perrisha was discharged from parenting coaching for lack of progress and that her attitude became poor. For instance, she failed to properly engage with the minors during sessions and failed to respond to Martino's prompts and questions. Additionally, Perrisha did not improve in the areas of safety and awareness of her home environment. For example, there was an instance where the home lacked heat, broken pencils were within access of the minors, and there were exposed outlets. However, Perrisha made progress in the areas of nutrition and attendance. Martino also stated that Perrisha acknowledged she left Ar. D. in William's care after the first incident, but Perrisha did not believe William caused the injuries.

¶ 58    Newton testified that Perrisha was cooperative with counseling, but reiterated Martino's concern that Perrisha was unable to parent independently. For example, she never resided anywhere independently, and there were occasions when Newton needed other family members present to help him explain his advice to her. Newton also questioned Perrisha's progress as she became involved with a man who was a convicted sex offender. We note that Perrisha takes issue with Newton's testimony wherein he testified that her boyfriend was a convicted sex offender, as she claims this statement was no more than "slanderous gossip" and that due process, at a minimum, would require a certified copy of the registration documentation. However, even if this was error, there was other evidence of his status as a sex offender, such as the October 2019 CASA report and Perrisha's own testimony.

¶ 59    Last, Dr. O'Riordan stated that Perrisha was a slow learner, had difficulty drawing conclusions, and did not anticipate problems. He noted that Perrisha could not look back to determine what she could have done differently. Dr. O'Riordan learned from Perrisha that there was a history of domestic violence with William, but that she "took it back to some extent." He also reiterated the same concerns as Martino and Newton regarding Perrisha's ability to function independently and that she faced significant obstacles to become a good parent. Based on the foregoing, the court's determination that Perrisha was unfit because she failed to make reasonable progress in the specified nine-month periods was not against the manifest weight of the evidence.

¶ 60 Nonetheless, Perrisha states that "[t]he manifest weight of the evidence leads to the inevitable conclusion that [she] will never be able to parent her children without help from her extended family. She does not have the mental and emotional capacity to parent and live independently, and in all probability never will." She states that requiring further progress is not possible, and it should not be held against her (citing *In re M.I.*, 2016 IL 120232).

¶ 61 Perrisha's reliance on *M.I.* is misplaced. In *M.I.*, the supreme court held that the language of section (b)—pertaining to parental unfitness for failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare—"contains no state of mind requirement, nor does it carve out an exception for faultless failure." *Id.* ¶ 26; 750 ILCS 50/1(D)(b) (West 2018). Here, Perrisha's unfitness was founded in section (m), for failure to make reasonable progress toward the return of the child during any nine-month period following an adjudication of neglect. See 750 ILCS 50/1(D)(m) (West 2018). Regardless, we agree that section (m) does not have a state of mind requirement and does not contain an exception for faultless failure, just as section (b) does not. However, we fail to see how this bolsters Perrisha's argument. We reiterate that the concept of reasonable progress is judged by an *objective* standard, based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. See *Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 62 D. Best Interest Determination

¶ 63 Once the trial court finds a parent unfit, all further considerations must yield to the child's best interest. *In re D.M.*, 298 Ill. App. 3d 574, 581 (1998). A reviewing court reviews a trial court's best interest determination under the manifest weight of the evidence standard. *In re S.D.*, 2011 IL App (3d) 110184, ¶ 33. In making this determination, the trial court must consider the following factors in the context of the child's age and developmental needs: the child's physical safety and welfare; development of the child's identity; the child's background; the child's attachments; the child's wishes and long-term goals; the child's community ties; the child's needs for permanence; the uniqueness of every family and child; the risks inherent to substitute care; and the preferences of the people available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). It is not in any child's best interest to remain without a permanent home for an extended period of time. *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 64 Our review of the best interest factors demonstrates that the minors' best interest favored terminating Perrisha's parental rights. The evidence demonstrated that the minors' physical safety and welfare—including food, shelter, and clothing—were met by the foster family. The development of identity of the minors also progressed in their placement, as they were in a safe environment and called their foster mother "mom." The minors bonded with their foster mother and sought her comfort. Additionally, community ties were developed as the foster mother placed Ay. D. in daycare, where she was receiving therapy for developmental delays. The minors also have a need for permanence. They were in this placement for over a year at the time of the termination hearing, and there was no indication that Perrisha would meet the requirements to become fit or even be able to care for the minors independently. The evidence also demonstrated that the minors had a loving bond with their foster mother, and she wished to provide them permanency.

¶ 65 Perrisha argues that the court relied on hearsay testimony that the foster parent wishes to adopt the children and that Newton's testimony that everything was fine in the foster home

"seems fanciful." She notes that the name and address of the foster parent were not disclosed and the foster parent did not testify. Not only did Perrisha fail to raise these issues before the trial court, but she fails to cite any authority to support her argument. Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) states that an appellant's argument "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Failure to comply with these requirements results in forfeiture. *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56. Thus, she has forfeited this contention.

¶ 66        Last, we briefly mention Perrisha's reliance on *In re B.C.*, 247 Ill. App. 3d 803 (1993), *abrogated on other grounds by In re Precious W.*, 333 Ill. App. 3d 893, 901-01 (2002). We find *B.C.* inapposite. In that case, the court found that the best interest of the minor did not favor the termination of the mother's parental rights as there was ample evidence that she had rehabilitative potential. As discussed above, those facts are not present here. See *B.C.*, 247 Ill. App. 3d at 805; see also *In re D.D.*, 196 Ill. 2d 405, 422 (2001) (each case involving the termination of parental rights is unique and must be decided on the facts and circumstances presented in that case).

¶ 67        For the foregoing reasons, the trial court's decision was not against the manifest weight of the evidence.

¶ 68                                        III. CONCLUSION

¶ 69        The judgment of the circuit court of Will County is affirmed in part and dismissed in part.

¶ 70        Affirmed in part and dismissed in part.

¶ 71        PRESIDING JUSTICE LYTTON, specially concurring:

¶ 72        I concur with the result.