**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 200537-U

Order filed May 19, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* M.D., | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| a Minor | ) | Rock Island County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-20-0537 |
| | ) | Circuit No. 17-JA-30 |
| v. | ) | |
| | ) | |
| J.D., | ) | |
| | ) | Honorable Theodore G. Kutsunis, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court.
Presiding Justice McDade and Justice Lytton concurred in the judgment.

**ORDER**

¶ 1    *Held*:  This court lacks jurisdiction to consider respondent's challenge to the trial court's adjudicatory and dispositional orders. The trial court did not err in finding respondent unfit and ultimately terminating respondent's parental rights. The trial court did not err in denying respondent's motion to disqualify the assistant State's Attorney.

¶ 2    Respondent, J.D., appeals following the trial court's determination that he was unfit to

parent his minor child, M.D., and that the minor's best interests favored terminating his parental

rights. Respondent challenges the trial court's adjudicatory and dispositional orders. He also challenges the trial court's findings as to his fitness and the termination of his parental rights. Finally, he contends the trial court erred when it denied his motion to disqualify the assistant State's Attorney. We dismiss in part and affirm in part.

¶ 3                                                    I. BACKGROUND

¶ 4        On August 22, 2017, the State filed a petition for adjudication of wardship. The petition alleged that M.D. (a minor) was neglected for the following reasons. First, her environment was injurious to her welfare. Second, on August 11, 2017, the Department of Children and Family Services (DCFS) received a report alleging "Substance Abuse by Neglect" to the minor's newly born sibling by their mother, L.C. DCFS subsequently added an allegation of substantial risk of harm and environment injurious to the health and welfare by neglect to M.D. Third, on September 30, 2016, L.C. pled guilty to the offense of possession of methamphetamine and was sentenced to 30 months' probation and 180 days' imprisonment stayed pending compliance. Due to L.C.'s repeated positive tests for cocaine and methamphetamines, the State filed a petition to revoke L.C.'s probation. Fourth, M.D.'s newborn sibling showed symptoms of withdrawal and subsequently started a methadone program. Fifth, L.C. returned to inpatient drug treatment as of August 21, 2017. Finally, the petition alleged that legal paternity for M.D. had not been established. Assistant State's Attorney Jeffery McKinley appeared on behalf of the State for most of the proceedings.

¶ 5        Respondent filed an appearance on August 23, 2017. At that time, he had not been established as the legal father of M.D. The trial court continued the cause pending deoxyribonucleic acid (DNA) tests to establish paternity.

¶ 6        On August 23, 2017, the trial court entered a temporary custody order finding probable cause that the minor was neglected due to the mother being in drug rehabilitation and the putative father's (respondent) current incarceration.

¶ 7        On October 12, 2017, the trial court appointed counsel to represent respondent.

¶ 8        On November 16, 2017, the trial court entered an order finding respondent to be the father of M.D.

¶ 9        On February 16, 2018, L.C. (M.D.'s mother) stipulated to the allegations in the petition for adjudication of wardship. The trial court continued the matter for an adjudicatory and dispositional hearing.

¶ 10       On March 16, 2018, the trial court held an adjudicatory and dispositional hearing. Following the hearing, the court entered a written order finding M.D. neglected based on the allegations in the petition for adjudication of wardship. The same day, the trial court entered a dispositional order finding respondent unfit based on the mother's stipulation to the facts alleged in the petition. The court placed M.D. in relative foster care (L.C.'s aunt and uncle by adoption). Also on the same day, the trial court entered a supplemental order requiring respondent to perform the following: (1) obtain a substance abuse evaluation and follow any recommendations for treatment, including random drug testing; (2) obtain a psychiatric evaluation and follow all recommendations for treatment, including taking medication if prescribed; (3) cooperate with counseling; (4) obtain and maintain appropriate housing and income; and (5) obtain a domestic violence assessment and follow all recommendations for treatment.

¶ 11       Respondent did not file a notice of appeal from the adjudicatory and dispositional orders.

¶ 12       On April 29, 2020, the State filed an amended petition to terminate respondent's parental rights. The petition alleged four grounds that respondent was an unfit parent. First, respondent

failed to maintain a reasonable degree of interest, concern, or responsibility as to M.D.'s welfare. Second, respondent failed to make reasonable efforts to correct the conditions that were the basis for the removal of M.D. Third, respondent failed to make reasonable progress toward the return of M.D. Last, respondent's repeated incarceration prevented him from discharging his parental responsibilities for M.D.

¶ 13 Brooke Matykiewicz testified at the fitness hearing. She acted as the caseworker in this case from January 2018 to November 2019. After the court adjudicated M.D. neglected, the court ordered respondent to complete services for mental health treatment, substance abuse treatment, domestic violence treatment, and to obtain stable housing and income.

¶ 14 Matykiewicz described respondent's attempts to complete the recommended services. Respondent completed a substance abuse evaluation in January 2018. The evaluation recommended outpatient treatment. Respondent began treatment for approximately two months. He failed to complete it and was unsuccessfully discharged from treatment. Respondent failed to reengage in substance abuse treatment after being discharged.

¶ 15 Respondent obtained a mental health evaluation in March of 2018. He was recommended for individual therapy. Respondent participated in therapy but was ultimately discharged in March 2018 for failing to attend. He never reengaged in therapy after his discharge.

¶ 16 Respondent refused to complete a domestic violence assessment. According to Matykiewicz, respondent did not believe he needed to participate in domestic violence treatment.

¶ 17 Matykiewicz next described respondent's background. Respondent lived with his mother in Davenport, Iowa. Respondent did have employment when not in prison. Respondent was arrested in July 2018 for drug charges. He failed to appear at a hearing and was later arrested in October 2018. Respondent remained in jail during Matykiewicz's time as the caseworker.

Respondent also spent time in jail on drug charges from the end of 2016 through October 2017. Respondent also spent a few days in jail in the summer of 2018.

¶ 18    Matykiewicz never considered respondent as a return home option for M.D. during the periods he spent in jail. When respondent lived with his mother, she also did not consider respondent a return home option because M.D. lived with relatives in Illinois and respondent spent most of the time in jail during that period.

¶ 19    According to Matykiewicz, during the relevant period, respondent failed to comply with domestic violence treatment. He failed to provide verification of his cooperation with mental health services and recommendations for treatment. Respondent did maintain employment outside of jail. He, however, never maintained housing suitable for the return of M.D. Matykiewicz did not believe that respondent made reasonable efforts or progress to correct the conditions that led to M.D.'s removal.

¶ 20    On cross-examination, Matykiewicz explained that she knew that respondent was offered services while in jail, but she did not have any information as to what service he utilized. She asked respondent to sign releases so that she could obtain such information, but he failed to sign the releases.

¶ 21    Matykiewicz also testified that prior to his time in jail, respondent did not consistently visit M.D. The foster parents offered respondent supervised visitation twice per week. There was no negative feedback from the visits. Respondent also had visits with M.D. while incarcerated. Respondent sent one letter to M.D. between September and November 2019.

¶ 22    Next, Vickie Wickersham testified. She acted as the caseworker from December 2019 to the time of the fitness hearing. She never had direct contact with respondent due to his incarceration in Iowa. She did not know if respondent engaged in any services after she took over

the case. Respondent failed to provide Wickersham with any consents for her to obtain information about his completion or participation in services. She did not know if respondent made any attempts to engage in services.

¶ 23     On cross-examination, Wickersham stated that the foster parents informed her that respondent had called M.D. a few times, but she did not know how often he called.

¶ 24     Respondent testified that he obtained a mental health evaluation and participated in two sessions with a counselor. According to respondent, he and the counselor agreed that he was not "really benefitting much from the mental health treatment, and [they] just discontinued it." Respondent explained that the counselor was not a psychiatrist and could not prescribe medications and he did not benefit "by just sitting there and talking to him."

¶ 25     Respondent acknowledged that he took a substance abuse evaluation in January 2018. He attended outpatient treatment. However, he stopped attending treatment in July 2018.

¶ 26     Respondent did not know why he was required to participate in domestic violence treatment. He admitted that he had previously been charged with domestic violence, but the charges were later dropped. Respondent did not know where he could go to obtain domestic violence treatment. His probation officer informed him where to go for the services, but respondent never followed through on obtaining domestic violence treatment. He explained that he had a "tight" schedule and did not "feel like [he] needed domestic violence treatment."

¶ 27     As to visitation, respondent stated that he received supervised visits with M.D. beginning in December 2017. He then received twice weekly visits one or two months after visitation began. The twice weekly visits ended when he went to jail in July 2018.

¶ 28     Respondent claimed that he was denied drug treatment while in jail. He did do a self-study parenting course and a Bible program while in jail. Respondent entered mental health treatment and had been taking medicine for his mental health while in jail.

¶ 29     Respondent met with Matykiewicz once a month while he was in jail. He informed her of his inability to participate in drug treatment, his being on medication, his parenting class, and the Bible study. Matykiewicz initially told him that he could not see or contact M.D. while in jail. Later, he learned that he could contact M.D., then he called her every night. M.D. also visited him in jail. According to respondent, he would talk to M.D. every night when he first arrived at prison, but recently the foster parents did not answer the phone when he called. He last spoke with M.D. by phone in February 2020. He would give M.D. gifts via his mother. M.D. would go to his mother's home for Christmas and received his gifts. He also sent M.D. a few cards with pictures. Since December 2019, respondent had not sent M.D. any cards from prison. He believed his conversations with M.D. were happy. However, he received a message from M.D.'s foster mother indicating that M.D. did not want to speak with him.

¶ 30     Respondent testified that he was eligible for parole in December 2020. He stated that he would live with his mother in Iowa while on mandatory supervised release.

¶ 31     Matykiewicz testified that she did tell respondent that he could not have contact with M.D. while incarcerated. However, the jail visitation policy changed and later allowed visitation between M.D. and respondent. She never received a report from respondent's mental health counselor indicating that respondent and the counselor both agreed to end respondent's therapy. To her knowledge, respondent was discharged from therapy for failing to attend sessions. Respondent also never provided Matykiewicz with verification that he was taking medications or

participating in voluntary services while in jail. Matykiewicz did not recall respondent reporting that he was prevented from engaging in drug treatment while in jail.

¶ 32    According to Matykiewicz, she asked respondent to provide verification of the services he engaged in while in jail. She contacted the jail to see if it could provide verification, but the jail refused to release the information because respondent failed to sign the necessary releases.

¶ 33    During the arguments of the parties, the guardian *ad litem* (GAL) noted that the State had proven that respondent failed to progress and comply with the required services. However, the GAL stated that he was "not on board with this one because it" sounded like he made attempts to stay in M.D.'s life.

¶ 34    After hearing the arguments, the court found that respondent had failed to show responsibility toward M.D.'s welfare. The court also found that respondent failed to make reasonable efforts and progress toward the return of M.D. The court further found that due to respondent's repeated incarceration, he could not discharge his parental responsibilities. The court found respondent unfit.

¶ 35    On July 2, 2020, Wickersham (the caseworker) filed a best interests report. The report provided the following information. At the time of the report, M.D. was six years old and had been in relative foster care since August 21, 2017. The foster parents had been married for 43 years and lived in a two-bedroom home in Moline. They worked at their respective employers for 30 years. M.D. bonded with the foster parents and expressed her desire to continue living with them. The foster parents also wished to adopt M.D.  The foster parents consistently met M.D.'s basic health safety, educational, and well-being needs. M.D. had been taking dance lessons for two years. She participated in swimming lesson and monthly events at the YMCA. M.D. did well in school. She and the foster mother spent a lot of time together doing homework, activities, and projects. M.D.

also had regular contact with her maternal siblings and other extended family members. The report recommended that it was in M.D.'s best interests to terminate respondent's parental rights.

¶ 36 On July 17, 2020, the cause proceeded to a best interest hearing. Wickersham testified that she acted as the caseworker since December 2019. She believed the foster parents to be in their mid-60's. The foster father is M.D.'s maternal uncle. M.D.'s mother had been adopted into the foster father's family. The foster father had cancer and was receiving chemotherapy. The cancer had not spread. Wickersham did not have any health concerns about the foster mother. Even if the foster father passed away, the foster mother was still willing to be a permanency option for M.D.

¶ 37 Wickersham noted that respondent had maintained regular contact with M.D. However, she was aware respondent had testified that the foster parents had stopped allowing communication between M.D. and respondent. She spoke with the foster parents about this issue. The foster parents denied that they had stopped communication between respondent and M.D.

¶ 38 Wickersham never heard from respondent's mother regarding her desire to have M.D. placed with her. Wickersham did not know respondent's mother's age, and Wickersham had never explored the possibility of placing M.D. with her. According to Wickersham, M.D. had already been with foster parents, and respondent's mother never asked Wickersham about placement.

¶ 39 Wickersham never observed any direct contact between M.D. and respondent. She, however, agreed that there were no reports of inappropriate contact. The phone visits went well, but she could not say if M.D. was excited to speak with respondent. Wickersham also did not know if M.D. had contact with her paternal siblings. Before the COVID-19 pandemic, M.D. visited with respondent's mother and spent every Saturday or every other Saturday night with her. At that time, M.D. had contact with her paternal siblings.

¶ 40    According to Wickersham, the foster parents met M.D.'s needs, including medical and personal care. She believed M.D. was comfortable with the foster parents. Wickersham had no concerns with the placement. She also had no concerns about M.D.'s safety with the foster parents.

¶ 41    Respondent testified next. After the fitness hearing, he spoke with M.D. every day on the phone. He believed he would be released from prison in December 2020. He said that M.D. was excited to talk to him every night; M.D. expressed a desire to live with respondent and his mother when he was released from prison.

¶ 42    Respondent claimed that his mother wanted M.D. to be placed with her. He expressed his interest in being there for M.D. when released from prison. He believed he could provide the stability and support M.D. required. M.D. expressed love and a sense of security with him. If M.D. were placed with his mother, M.D. would have contact with his extended family.

¶ 43    On cross-examination, respondent admitted that he was introduced to methamphetamine in 2016. He spent "almost half the time between now and then" in prison. He claimed that he did not have substance abuse treatment available to him in prison but was told to participate in treatment upon his release.

¶ 44    Respondent had in-person visits with M.D. while in jail until the COVID-19 pandemic.

¶ 45    Respondent's mother, Nida, testified. She had expressed her interest in having M.D. placed with her several times to the caseworkers. However, she never told the current caseworker of her desire to have M.D. placed with her. Nida was concerned that if M.D. were placed with the foster parents, M.D. would not have contact with her paternal family.

¶ 46    During arguments, the GAL noted that the foster parents cared for M.D. and he observed that M.D. was comfortable, bonded, and enjoyed them. However, the GAL had listened to respondent and his desire to remain in M.D.'s life. The GAL said that he was "not ready to shut

the door on that possibility" and respondent had "done everything he can to stay active in her life." The GAL believed that respondent was still a potential option, and it was in M.D.'s best interests for respondent to remain an option unless he could not turn his life around.

¶ 47 Following the arguments of all the parties, the trial court took the matter under advisement.

¶ 48 On August 6, 2020, respondent filed a "motion to disqualify prosecutor." The motion alleged there existed "an undisclosed, pre-existing personal relationship between the foster parent, Florence [C.], and ASA McKinley, which has continued throughout the case." Florence had commented on McKinley's personal Facebook page on August 1, 2020. The attached exhibit shows a comment Florence made on McKinley's personal Facebook which stated, "Make sure to keep me updated on any chocolate sales!" McKinley replied to the messaged with, "Lol, will do!" Florence's personal Facebook page also showed a post from September 5, 2016, which included two photographs of Florence at a political campaign event wearing a McKinley campaign shirt. The caption for the post stated, "[i]t's an extravaganza! 2 Labor Day Parades! Marching for Jeff McKinley for Circuit Clerk. Ya'll come out and wave Hi!" Florence was also a committeeman, a position she held at the time of McKinley's 2016 campaign; McKinley was the treasurer for the same local political party. McKinley never disclosed the personal relationship with Florence at any time during the instant proceedings, which the motion alleged violated the Illinois Rules of Professional Conduct. The motion requested the following relief: (1) an order requiring the State to assign a new prosecutor to the case; (2) "[v]acating all findings related to and dismissing the Supplemental Petition to Terminate Parental Rights"; (3) reinstatement of the permanency goal of return home in 12 months; (4) reinstatement of visitation for the parents; (5) a new service plan for the parents; and (6) a six-month permanency review hearing.

¶ 49    McKinley filed a written response to the motion to disqualify. His motion alleged as follows. DCFS was solely responsible for the placement decisions regarding M.D. McKinley had no advanced knowledge or played any role in where DCFS placed M.D. The foster parents were not parties to the proceedings. McKinley and Florence are both political precinct committeemen. McKinley served as treasurer and would see Florence at central committee meetings. Although McKinley knew Florence through political activities, their relationship was more of an acquaintanceship than that of a friendship.

¶ 50    As to the parade referenced in respondent's motion to disqualify, McKinley stated that Florence is an active political volunteer, had attended many parades and would often wear the shirts of the various candidates. On September 5, 2016, Florence did walk in the Labor Day parade for McKinley's campaign for circuit clerk. The parade occurred prior to the filing of this case. Florence did not play any role in his campaign and did not financially contribute to his campaign.

¶ 51    As to the comments regarding chocolates, McKinley stated that Florence purchased chocolates from a fundraising event that McKinley's son's school conducted. Many other Facebook friends of McKinley and other attorneys he worked with also purchased chocolates from the fundraiser.

¶ 52    To McKinley's knowledge, the two Facebook messages noted in respondent's motion are the only exchanges he and Florence had on Facebook. McKinley and Florence are not social friends. He had no personal relationship with Florence other than what was described in his response to respondent's motion to disqualify.

¶ 53    McKinley never made a formal disclosure regarding his acquaintance with Florence. However, the issue was informally discussed with caseworkers and opposing counsel outside formal hearings.

¶ 54     McKinley further averred that at all times in this case, his actions and recommendations were based on those contained in the various reports, status alerts, and legal screens submitted or conducted by DCFS and the caseworkers. Florence had nothing to do with the fitness hearings conducted in this case. The evidence and testimony presented related entirely to respondent's engagement in the services and efforts and progress toward returning M.D. home.

¶ 55     As to the possibility of terminating respondent's parental rights and Florence's ability to adopt M.D., McKinley noted that it was not his decision as to who would be allowed to adopt M.D.; that decision rested with DCFS and the caseworkers. McKinley had no power over who DCFS recommended for adoption.

¶ 56     Finally, McKinley "categorically affirm[ed] that all actions he took in this case were entirely appropriate, free from bias, consistent with agency recommendations and no different than those typically taken in other juvenile cases to which he is and has been assigned."

¶ 57     At the hearing on the motion to disqualify, respondent's counsel argued, in relevant part, that respondent did not need to establish prejudice resulting from the alleged conflict due to his relationship with Florence. According to counsel, the relationship alone was sufficient to disqualify McKinley and start the proceedings anew.

¶ 58     In response, McKinley argued that he did not have a "significant" relationship with Florence. McKinley never made a formal disclosure of his connection to Florence because "it never crossed [his] mind." He acknowledged that he did see Florence attend hearings in this case. She and McKinley would only exchange pleasantries if they spoke before court. He emphasized that Florence was not a party in this case, and he had no control over M.D.'s placement. McKinley noted that every action taken by the court in this case was based "in line with the recommendations submitted by the [DCFS]."

¶ 59 The trial court then asked McKinley several questions. McKinley answered as follows. He never represented Florence. She never sought legal advice from him. While he never talked to her about the details of the case outside of court, he did recall her telling him that she and M.D. would be dressing in costumes for a parade.

¶ 60 The trial court took the matter under advisement.

¶ 61 On November 18, 2020, the court entered a written order denying respondent's motion to disqualify. The court found no evidence of bad faith, prejudice, or bias on the part of McKinley. Specifically, the court found "no evidence in the record to indicate McKinley actually engaged in or that there is a perception that he engaged in any unethical conduct in the handling of the case."

¶ 62 The cause proceeded to a ruling on the best interests of M.D. The trial court noted that M.D. had been with her current foster parents since August 21, 2017. The foster parents met M.D.'s health, safety, educational, and well-being needs. M.D was taking dance lessons, participated in the YMCA where she took swimming lessons, and participated in other activities. The minor was doing well in school. The foster parents had been married for 43 years and were both employed. The parents expressed their desire to adopt M.D. The foster parents spent a lot of time doing homework and projects with M.D. After weighing the statutory factors, the court found it was in M.D.'s best interests to terminate respondent's parental rights. The court entered a written order terminating respondent's parental rights.

¶ 63                                                     II. ANALYSIS

¶ 64                                                   A. Motion to Strike

¶ 65 During the pendency of this appeal, respondent filed a motion to strike the State's brief. Respondent moved to strike the portion of the State's brief which referred to public records from the websites of the Illinois and Iowa Department of Corrections. The records were not presented

in the trial court, but the State has supplemented the record on appeal with these documents. The records show that defendant's projected release date from the Illinois Department of Corrections is June 9, 2023. This contradicts respondent's testimony that his expected release from prison was in December of 2020.

¶ 66    We deny respondent's motion. Illinois courts often take judicial notice of facts that are readily verifiable by referring to sources of indisputable accuracy. *People v. Mata*, 217 Ill. 2d 535, 539 (2005). Frequently, the source that is judicially noticed is a court record or a public document, including the Department of Corrections' records on its website. See, *e.g.*, *Cordrey v. Prisoner Review Board*, 2014 IL 117155, ¶ 12 n.3. We will take judicial notice of the Department of Corrections' records on its website.

¶ 67                    B. Adjudicatory and Dispositional Orders

¶ 68    Respondent challenges the March 16, 2018, adjudicatory and dispositional orders. Respondent contends the trial court violated his due process rights by failing to enter a written order containing the factual basis for the adjudicatory and dispositional orders.  The State responds that this court lacks jurisdiction to consider arguments related to the March 16, 2018, adjudicatory and dispositional orders because respondent failed to file a timely notice of appeal from those orders. Instead, respondent filed his notice of appeal from the December 18, 2020, order terminating his parental rights.

¶ 69    We first address whether we have jurisdiction, which we review *de novo*. *In re Custody of C.C.*, 2013 IL App (3d) 120342, ¶ 51. The issue is whether this court has jurisdiction to review the propriety of the March 16, 2018, adjudicatory and dispositional orders, following an appeal from the termination of parental rights on December 18, 2020. We find that we lack jurisdiction to consider respondent's challenge to the March 16, 2018, orders.

¶ 70    As this court explained in *In re Ay. D.*, 2020 IL App (3d) 200056, ¶ 37:

> " '[A]n adjudicatory order is a step in the procedural progression leading to the dispositional order.' *In re D.R.*, 354 Ill. App. 3d 468, 473 (2004). At an adjudicatory hearing, the court decides whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-21(1) (West 2018). The dispositional order that follows determines the placement of the minor. *D.R.*, 354 Ill. App. 3d at 473. An adjudicatory order is not a final and appealable order.[] *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). Instead, the dispositional order is the final order from which an appeal properly lies. *Id.* Appeals from final orders under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)), other than those involving the delinquency of minors, are governed by the rules applicable to civil cases. Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001). To perfect an appeal in a civil case, a party must file a notice of appeal within 30 days after the entry of a final order, unless an extension of the 30-day limitation is granted. Ill. S. Ct. R. 303(a), (d) (eff. July 1, 2017)." *Id.*

¶ 71    Here, respondent filed his notice of appeal in December 2020 following the trial court's termination of his parental rights. He did not request an extension pursuant to Rule 303(d). To challenge the validity of the court's March 2018 adjudicatory and dispositional orders, he needed to file his notice of appeal within 30 days of the court's March 2018 orders. See *M.J.*, 314 Ill. App. 3d at 655 (an adjudicatory order is not final and appealable and any issues with that order must be

raised following the entry of the dispositional order that follows); see also *In re S.P.*, 2019 IL App (3d) 180476, ¶ 47 ("the dispositional order is a final and appealable order and the proper vehicle to appeal a[n] adjudication of abuse or neglect"). Respondent did not file an appeal. Thus, we do not have jurisdiction to address the validity of the March 16, 2018, adjudicatory and dispositional orders. See *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 50 (finding the court lacked jurisdiction to review the propriety of the adjudication and dispositional orders following an appeal from the termination of parental rights because a timely appeal was not filed from those orders); *In re Ay. D.*, 2020 IL App (3d) 200056, ¶ 38 (same).

¶ 72                                C. Fitness Finding

¶ 73        Next, respondent challenges the trial court's fitness finding. Respondent contends that the State failed to meet its burden in proving his parental unfitness. The State must prove parental unfitness by clear and convincing evidence, and the trial court's findings must be given great deference because of its superior opportunity to observe the witnesses and evaluate their credibility. *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004). We will not reverse a trial court's finding of parental unfitness unless it was contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498 (2002). A finding of parental unfitness may be based on evidence sufficient to support any one statutory ground. *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 74        The trial court found respondent unfit to parent M.D. due to his failure to make reasonable progress toward the return of M.D. within nine months (March 16, 2018, through December 16, 2018, and December 17, 2018, through September 17, 2019) after the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2018).[1] Reasonable progress is judged by an objective standard based

---

[1]The trial court also found respondent unfit under the three other grounds alleged by the State. We need not address these alternative grounds because a finding of parental unfitness may be based on evidence sufficient to support any one statutory ground. *In re D.D.*, 196 Ill. 2d at 422.

- 17 -

upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court directives, in light of the condition that gave rise to the removal of the child and other conditions that later become known that would prevent the court from returning custody of the child to the parent. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). Failure to make reasonable progress toward the return of the minor includes the parent's failure to substantially fulfill his or her obligations under the service plan and failure to correct the conditions that brought the child into care. *Id.* at 217.

¶ 75    Upon review, we find the trial court properly concluded that respondent failed to make reasonable progress toward correcting the conditions that led to M.D.'s removal. The service plan required respondent to: (1) obtain a substance abuse evaluation and follow any recommendations for treatment, including random drug testing; (2) obtain a psychiatric evaluation and follow all recommendations for treatment, including taking medication if prescribed; (3) cooperate with counseling; (4) obtain and maintain appropriate housing and income; and (5) obtain a domestic violence assessment and follow all recommendations for treatment.

¶ 76    Here, respondent fell well short of the service plan goals. Respondent did complete a substance abuse evaluation. However, his participation in treatment ended in an unsatisfactory discharge due to his failure to attend. He also obtained a mental health evaluation but stopped attending counseling. Respondent never participated in a domestic violence assessment because he did not believe he needed domestic violence counseling. Although respondent claimed to have participated in some voluntary services, he failed to cooperate with the caseworker and provide her with verification of those services. Further, while respondent claimed to have difficulty in

participating in certain services due to his incarceration, we note that respondent's current circumstances are the result of his own decisions. In fact, respondent spent much of the time during the nine-month period in and out of jail on drug charges. Under the circumstances, he made no measurable or demonstrable movement toward the goal of reunification. Therefore, the trial court did not err when it found him to be unfit.

¶ 77                              D. Best Interests Finding

¶ 78        Next, respondent contends the trial court erred when it found that the best interests of M.D. were furthered by terminating respondent's parental rights and placing M.D. for adoption by her foster parents. A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 79        At the best-interests phase, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State bears the burden of proving by a preponderance of the evidence that termination is in the best interests of a minor. *Id.* at 366; *In re Deandre D.*, 405 Ill. App. 3d 945, 953 (2010). Section 1-3(4.05) of the Juvenile Court Act of 1987 sets forth various factors for the trial court to consider in assessing a minor's best interests. These considerations include: (1) the minor's physical safety and welfare; (2) the development of the minor's identity; (3) the minor's familial, cultural, and religious background; (4) the minor's sense of attachment, including love, security, familiarity, and continuity of relationships with parental figures; (5) the minor's wishes

and goals; (6) community ties; (7) the minor's need for permanence; (8) the uniqueness of every family and every child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018).

¶ 80      We find the statutory factors favor a finding that it was in M.D.'s best interests to terminate respondent's parental rights. During the proceedings, respondent spent the bulk of the time in jail. There is no indication that respondent would become fit or able to care for M.D. until at least 2023, at which time he would be eligible for mandatory supervised release. However, M.D. already spent almost three years with her foster family by the conclusion of the instant proceedings. By the time respondent is eligible for parole, M.D. would have spent almost six years with her foster family. The foster family provided for the physical safety and welfare of M.D., including food, shelter, clothing, and healthcare. The foster family is a relative placement, and M.D. has had continued contact with her youngest sibling. M.D. has bonded with her foster parents. She was doing well in school and also participated in dance lessons. Her foster mother assisted her with homework, activities, and school projects. In sum, M.D. was living in a stable, loving environment and we cannot say the trial court abused its discretion in terminating respondent's parental rights.

¶ 81      In reaching this conclusion, we reject respondent's reliance upon the GAL's statement at the termination hearing that he was "not ready to shut the door on that possibility" and respondent had "done everything he can to stay active in her life." Respondent contends that the trial court's decision was against the manifest weight of the evidence because the GAL believed that respondent should remain as an option for placement. We note, however, that the trial court is the ultimate finder of fact and is not bound to follow the recommendations of the GAL. See *Taylor v. Starkey*, 20 Ill. App. 3d 630, 634 (1974).

¶ 82                            E. Motion to Disqualify

¶ 83    Finally, respondent contends that the trial court erred when it denied his motion to disqualify Assistant State's Attorney McKinley. Respondent contends that McKinley should have been disqualified due to his connection with the foster mother, Florence. Respondent makes two arguments on this issue.

¶ 84    First, respondent notes that M.D.'s mother currently has an appeal pending in which she also challenges the denial of the motion to disqualify. Respondent adds that he adopts her argument on this issue. However, respondent failed to offer any explanation or analysis regarding her argument. Respondent's failure to cite authority and make any argument on this results in a forfeiture of the argument. See *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 401 Ill. App. 3d 868, 881 (2010) (mere contentions—without argument or citation to authority—do not merit consideration on appeal).

¶ 85    As to respondent's second claim, we note that he has now abandoned his argument below that McKinley's relationship with Florence violated the Illinois Rules of Professional Conduct. Instead, he now argues for the first time that he is entitled to an automatic remand for the trial court to consider disqualifying McKinley under section 3-9008(a-10) of the Counties Code (55 ILCS 5/3-9008(a-10) (West 2020). Section 3-9008(a-10) governs whether to appoint a special prosecutor when a State's Attorney has an actual interest in the outcome of a case.

¶ 86    However, respondent's motion to disqualify did not seek a hearing pursuant to section 3-9008(a-10). Instead, he relied upon the provision of the Illinois Rules of Professional Conduct. As respondent concedes, he forfeited his argument pursuant to section 3-9008(a-10) by failing to raise the issue below. See *In re Matter of Chance H.*, 2019 IL App (1st) 180053, ¶ 45. Nevertheless, he contends he is entitled to an automatic remand under the plain-error doctrine. According to respondent, "[b]ecause termination of parental rights is the most severe civil remedy available to

a party, the error is of such magnitude that where impropriety in the process exist, it must be reviewed." Therefore, respondent concludes that the cause should be remanded for an evidentiary hearing so that the trial court can analyze the claim under section 3-9008(a-10).

¶ 87 The trial court already held an evidentiary hearing on whether McKinley should be disqualified. The trial court rejected respondent's related argument under the Illinois Rules of Professional Conduct. The record from that hearing is sufficient to consider respondent's claim on appeal. See *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 74 (noting that this court can affirm a trial court's judgment on any grounds which the record supports even if those grounds were not argued by the parties).

¶ 88 The first step in plain-error analysis is to conduct a substantive review of the issue to determine whether an error occurred. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009). The determination of whether to appoint a special prosecutor rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *People v. Morley*, 287 Ill. App. 3d 499, 503-04 (1997). The threshold for finding an abuse of discretion is high—an abuse of discretion will be found only if no reasonable person would take the view adopted by the trial court. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008).

¶ 89 At the hearing on respondent's motion to disqualify, respondent presented evidence that the foster mother, Florence, wore a campaign shirt supporting McKinley at a parade that predated the filing of the petitions in this case. She posted a photograph of herself at the parade and included a comment supporting McKinley. She also posted a comment on McKinley's personal Facebook page asking McKinley about an upcoming fundraiser for his son's school. McKinley and Florence were both active in the local political party. However, McKinley described his relationship with McKinley as merely an acquaintanceship. McKinley never represented Florence and also never

discussed the instant case with her. McKinley categorically denied being influenced in any way in these proceedings and also noted that he had no control over where DCFS would place M.D. for foster care. After hearing the evidence, the trial court found no evidence of bad faith, prejudice, or bias on the part of McKinley. The trial court further held that the record contained no evidence that McKinley actually engaged in or that there was a perception that he engaged in any unethical conduct in handling the case.

¶ 90 Applying the facts of this case to section 3-9008(a-10), the appointment of a special prosecutor is not warranted. Section 3-9008(a-10) provides:

> "The court on its own motion, or an interested person in a cause or proceeding, civil or criminal, may file a petition alleging that the State's Attorney has an actual conflict of interest in the cause or proceeding. The court shall consider the petition, any documents filed in response, and if necessary, grant a hearing to determine whether the State's Attorney has an actual conflict of interest in the cause or proceeding. If the court finds that the petitioner has proven by sufficient facts and evidence that the State's Attorney has an actual conflict of interest in a specific case, the court may appoint some competent attorney to prosecute or defend the cause or proceeding." 55 ILCS 5/3-9008(a-10) (West 2020).

A special prosecutor may be appointed when (1) the prosecutor is interested in the case as a private individual, (2) the prosecutor is a party to the litigation, or (3) the continued participation by the prosecutor creates an appearance of impropriety. *People v. Weeks*, 2011 IL App (1st) 100395, ¶ 46. Respondent bases his argument on the third situation—the appearance of impropriety.

¶ 91         Respondent makes the conclusory argument that McKinley's acquaintance with Florence somehow created a question of partiality. Respondent claims that "[a] friend of the foster parents terminated a fathers' rights so they could move towards adopting the child, all while the foster parents repeatedly obstructed the father's reunification with their daughter." The mere fact that Florence supported McKinley's campaign (prior to the filing of the instant case) and made one lone comment on McKinley's personal Facebook page does not create a question of partiality. Their participation in the same local political group also does not show an appearance of impropriety. Disqualification of a state's attorney takes more than mere suspicion or speculation. *McCall v. Devine*, 334 Ill. App. 3d 192 (2002). McKinley had no control over DCFS's choice in placing M.D. in foster care. Respondent presented no facts tending to show that McKinley's relationship with Florence had any impact on McKinley's decisions in this case. As such, we find the minimal relationship between McKinley and Florence insufficient to establish the appearance of impropriety. Therefore, the trial court did not err when it denied respondent's motion to disqualify McKinley—even though the court relied on different grounds.

¶ 92         In reaching this conclusion, we reject respondent's reliance upon *People v. Lang*, 346 Ill. App. 3d 677 (2004). In *Lang*, the court found that the appointment of a special prosecutor was warranted. There, the assistant state's attorney secretly followed the defendant, hid behind potted plants, called the police, led the prosecution, and acted as the State's key witness. The *Lang* court found that such behavior made it seem "that the State's Attorney's office was obsessed with finding evidence against the defendant to obtain a conviction against him at all costs." *Id.* at 684. By contrast, McKinley's connection to Florence had nothing to do with the initiation of the proceedings. Respondent also presented no evidence showing any particular steps taken (or not taken) by McKinley that were influenced by his connection to Florence. In fact, McKinley

categorically denied that his relationship with Florence influenced any actions he took in this case. In short, this case does not present the type of behavior described in *Lang*. See *In re Appointment of Special Prosecutor*, 2019 IL App (1st) 173173, ¶¶ 39-40 (calling into question the continued validity of *Lang* as well as distinguishing *Lang* from the facts of the case)

¶ 93                                    III. CONCLUSION

¶ 94         For the foregoing reasons, we affirm in part and dismiss in part the judgment of the circuit court of Rock Island County.

¶ 95         Affirmed in part and dismissed in part.