2022 IL App (1st) 220354

No. 1-22-0354

Opinion filed September 7, 2022

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* Q.P., A Minor, | ) | |
| | ) | |
| (The People of the State Of Illinois, | ) | |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | |
|   v. | ) | |
| | ) | |
| B.V. and Q.P., | ) | Appeal from the |
| | ) | Trial Court of |
|     Respondents | ) | Cook County. |
| | ) | |
| (B.V., Respondent-Appellant; Q.P., Respondent-Appellee; | ) | No. 19 JA 1227 |
| The Department of Children and Family Services, | ) | |
| Intervenor-Appellee)). | ) | Honorable |
| | ) | Patrick T. Murphy, |
| | ) | Judge, presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1    This case comes before us pursuant to Illinois Supreme Court Rule 308(a) (eff. Oct. 1, 2019). The trial court certified two questions for our review. First: "Does the [c]ourt have the authority under 89 Ill. Adm. Code 328[.3](b)(1), when asked by DCFS to approve an out-of-state

move, to find it is not in the child's best interest to move out-of-state and prevent the move?" Second: "Does the court have the authority under [the Juvenile Court Act of 1987,] 705 ILCS 405/2-28(2.5)[,] to find it is not in the best interest of a child to move out-of-state because the [c]ourt determines that the child's planned placement is not necessary or appropriate?" We answer both questions in the affirmative. However, we reverse the trial court's denial of the Department of Children and Family Services' (DCFS) motion to place the minor out-of-state because that ruling did not comply with the requirements of the Juvenile Court Act of 1987 (Juvenile Court Act), specifically section 2-28(2.5) (705 ILCS 405/2-28(2.5) (West 2020)). We reverse the trial court's ruling and remand this matter for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3        On May 23, 2019, respondent B.V. gave birth to minor respondent, Q.P.[1] Several months later, the State filed a petition for adjudication of wardship, alleging that Q.P. was neglected due to an injurious environment and abused due to a substantial risk of physical injury. Specifically, the petition alleged that B.V. and Q.P. tested positive for illegal substances at the time of Q.P's birth, that B.V. had four other children in DCFS custody, and that she had not cooperated with a care plan for Q.P since June 2019. The trial court granted temporary custody of Q.P. to the DCFS guardianship administrator. Following an adjudicatory hearing on March 3, 2020, the court found that Q.P. was abused or neglected because he was born exposed to controlled substances and had four older siblings in DCFS custody. Following a dispositional hearing on October 9, 2020, the

_____

[1]The record and briefs variously refer to the minor's father as "Q.P.," "Q.P., Jr.," and "Q.P., Sr." Hereafter, any reference to "Q.P." means the minor, not his father.

court found that both parents were unable to care for Q.P. and set a permanency goal of returning Q.P. home within 12 months.

¶ 4     DCFS first placed Q.P. with his great aunt in Dolton, Illinois, then with a nonrelative foster parent, and then with his great aunt again after the foster parent became ill and died. On January 5, 2021, DCFS removed Q.P. from his great aunt's home after discovering that his parents also lived in that home and had a physical altercation in front of him. DCFS placed Q.P. with nonrelative foster parents S.K.-M. and her husband A.M. in McCook, Illinois. On February 1, 2021, S.K.-M. told the court that she and her husband were able to adopt Q.P., and the court changed the permanency goal to termination of parental rights.

¶ 5     The trial court conducted a hearing on the issue of placing Q.P. out-of-state on July 21, 2021. DCFS caseworker Sabrina Fisher stated that she planned to conduct an interstate compact to place Q.P. with his maternal aunt, C.V., in Phoenix, Arizona.[2] The court responded that "it's not in the best interests of the kid to be bounced from home to home to home" and ordered that DCFS could not remove Q.P. from his foster home until the court held a best interest hearing. On August 31, 2021, DCFS caseworker Vicky Carter stated that the interstate compact had been approved. She also opined that placing Q.P. with C.V. would be in his best interest because C.V. was a "great relative caregiver" and because Q.P. would live near his grandmother and four siblings in Phoenix. The court stated that "it is never in a kid's best interest to move the kid around" and again ordered that Q.P. could not be removed from his foster home without a best interest hearing.

---

[2]"Interstate compact" refers to the Interstate Compact on the Placement of Children Act, which facilitates cooperation between states for the interstate placement of children. 45 ILCS 15/0.01 *et seq.* (West 2020).

¶ 6    In November 2021, the trial court conducted a hearing on DCFS's motion to approve placement of Q.P. with his aunt in Arizona.[3] Carter testified that Q.P. was born exposed to cocaine and lived with his mother and great aunt after he was discharged from the hospital. B.V. stopped communicating with DCFS in June 2019, so DCFS removed Q.P. from his mother and great aunt's home in November 2019. DCFS briefly placed Q.P. with a nonrelative foster parent, then returned him to his great aunt's home. DCFS again removed Q.P. from his great aunt's home when it learned that both his parents were living in that home and had a physical altercation in front of him. Q.P. was then placed with S.K.-M. and A.M. in January 2021. In June 2021, Q.P. exhibited "severe language delay," "some delays in fine motor and gross motor skills," and "emotional and physical delays." Q.P. received speech therapy, occupational therapy, and developmental therapy to treat those delays.

¶ 7    When DCFS placed Q.P. with S.K.-M. and A.M., it simultaneously explored placing him with relatives in Arizona. DCFS first considered placing Q.P. with his grandmother in Arizona because she had adopted his four older brothers. However, Q.P.'s grandmother told DCFS that she could not take custody of a very young child. Approximately a month later, Q.P.'s aunt C.V., who lived about 30 minutes away from his grandmother, informed DCFS that she was interested in taking custody of him. C.V. worked as the manager of a fast-food restaurant and previously worked at a day care center with children of different ages and abilities. She also had three children of her own. Fisher conducted the interstate compact, and Carter conducted a clinical staffing. Carter also developed a plan to transition Q.P. from Illinois to Arizona, which included video calls with C.V. so he could become familiar with her. Carter acknowledged that a placement change could cause

---

[3]DCFS's motion stated that Q.P.'s aunt lived in Arkansas. However, everything in the record indicates that she lived in Arizona, and the parties' briefs agree that she lived in Arizona, not Arkansas.

trauma but testified that children of Q.P.'s age "are resilient" and "can pretty much get bonded or become bonded with the next caregiver," and that Q.P. had demonstrated such resilience in foster care. Carter testified that placing Q.P. with C.V. would be in his best interest because she would be a loving relative caregiver, because Q.P. would grow up near his siblings, and because Q.P. generally appeared happier around his family. Carter acknowledged that Q.P. was "bonded and attached" to his current foster parents but also testified that Q.P. was "reluctant to go back to the foster parent[s]" when she visited him in their home. Although the court stated that it "want[ed] to hear from both the present foster parent and the mother," no other witnesses testified.

¶ 8    DCFS moved into evidence a home study and evaluation report prepared by Lutheran Social Services of the Southwest (Lutheran Social Services). This report states that C.V. was 27 years old and lived with her three daughters in a two-bedroom apartment in Phoenix, Arizona, although Carter testified that C.V. was in the process of moving into a three-bedroom apartment as of November 2021. C.V.'s financial information indicated that she could support Q.P. She "expressed her interest in helping keep [Q.P.] in a safe and stable home" and stated that she was willing to adopt him. Lutheran Social Services recommended that C.V. be approved as a caregiver for Q.P.

¶ 9    DCFS also introduced a report summarizing its September 2021 clinical staffing. This report stated that C.V. visited Q.P. in April 2021 and introduced him to his brothers and her daughters via a video call. The report also indicated that a move to Arizona would not disrupt his therapy services. The clinical staffing concluded that Q.P. should be placed with C.V. because that placement would provide "increased sibling visitation and bonding, and participation in family holidays and other special events with extended family; thus not only strengthening his sense of

attachment and self-confidence but also his understanding of heritage, origin, and identity through daily family ties and bonding experiences." The clinical staffing acknowledged that Q.P. was "bonded and attached in his current placement" with S.K.-M. and A.M. and that a "move may cause attachment and adjustment difficulties," but explained that a "transition plan *** can help him transfer his attachment relationship from one caregiver to another."

¶ 10    The guardian *ad litem* (GAL) moved into evidence a note from DCFS's file, which stated that, on May 31, 2019, Q.P.'s grandmother in Arizona told caseworker Debra Robinson that she adopted B.V.'s "older children" but "gave them back to her" two years prior.

¶ 11    During this hearing, the court requested studies regarding the impact of movement between foster homes on children. The studies that the parties provided are included in the record on appeal. The GAL submitted a 2007 study that concluded that "[c]hildren with unstable placements were more likely to have behavioral problems than children who achieved early stability." It also submitted a 2000 study that found that "volatile placement histories contribute negatively to both internalizing and externalizing behavior of foster children, and that children who experience numerous changes in placement may be at particularly high risk for these deleterious effects."

¶ 12    B.V. submitted six studies. A 2011 study concluded that, "[r]elative to children in foster care, those in kinship care displayed significantly lower levels of problem behaviors." A 2009 study found that "long-term kinship care alone does not result in more positive adult mental health." A 2008 study concluded that "[c]hildren placed into kinship care had fewer behavioral problems three years after the placement than children who were placed into foster care" and encouraged "efforts to maximize placement of children with willing and available kin when they enter out-of-home care." A 2000 study found that "[c]hildren in kinship care, regardless of age,

had fewer placement moves than those in nonkinship care" and that "children who had more than one placement move during their first year of care were more likely to experience placement instability in the long-term." A 1999 study found that the probability of restoring a child to his or her family decreases the longer the child spends in foster care. Another 1999 study concluded that "simply counting the number of placements children experience" is an inadequate methodology in this field of study.

¶ 13    The parties also submitted memoranda of law regarding the court's authority to rule on DCFS's motion. The State argued that the court should grant DCFS's motion pursuant to section 2-28 of the Juvenile Court Act (705 ILCS 405/2-28 (West 2020)). B.V. argued that the trial court had to defer to DCFS's placement decision unless the court determined that the Arizona placement would cause "manifest injustice." The GAL argued that the court should deny DCFS's motion pursuant to both section 2-28(2.5) of the Juvenile Court Act (*id.* § 2-28(2.5)) and section 328.3(b)(1) of Title 89 of the Illinois Administrative Code (89 Ill. Adm. Code 328.3(b)(1) (1999)) because placement in Arizona was not in Q.P.'s best interest.

¶ 14    On March 4, 2022, the trial court denied DCFS's motion for out-of-state placement. The court expressed concern about "Reactive Attachment Disorder" as a result of Q.P. being "moved and moved and moved." Reviewing best interest factors, the court explained that Q.P. was safe, loved, and secure in his current foster home and had 14 months of community ties there, but development of his identity would be better with his relatives. The court stated that it "kn[e]w nothing about the Arizona home" but acknowledged that Q.P.'s family in Arizona appeared to be "very decent people who desperately would like to have [him] in their care." The court concluded that any move to any other home was contrary to Q.P.'s best interest and that his placement with

S.K.-M. and A.M. was "necessary and appropriate." The court certified the following questions pursuant to Illinois Supreme Court Rule 308(a) (eff Oct. 1, 2019):

"1. Does the [c]ourt have the authority under 89 Ill. Adm. Code 328[.3](b)(1), when asked by DCFS to approve an out-of-state move, to find it is not in the child's best interest to move out-of-state and prevent the move?

2. Does the court have the authority under 705 ILCS 405/2-28(2.5) to find it is not in the best interest of a child to move out-of-state because the [c]ourt determines that the child's planned placement is not necessary or appropriate?"[4]

¶ 15                                            II. ANALYSIS

¶ 16      "Supreme Court Rule 308 provides a remedy of permissive appeal for interlocutory orders where the trial court has deemed that they involve a question of law as to which there is substantial ground for difference of opinion and where an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Apollo Real Estate Investment Fund, IV, L.P. v. Gelber*, 398 Ill. App. 3d 773, 778 (2009); Ill. S. Ct. R. 308(a) (eff. Oct. 1, 2019). "We apply a *de novo* standard of review as to legal questions presented in an interlocutory appeal brought pursuant to Supreme Court Rule 308(a)." *Apollo Real Estate*, 398 Ill. App. 3d at 778.

¶ 17      This appeal involves the interpretation of both the Juvenile Court Act and the Illinois Administrative Code. Administrative rules and regulations have the force of law, and we interpret

---

[4]The first certified question references "89 Ill. Adm. Code 328(b)(1)." There is no section with that designation. We construe the certified question as referring to section 328.3(b)(1), which addresses court approval of out-of-state placement of Illinois children. 89 Ill. Adm. Code 328.3(b)(1) (1999). We modify the first certified question to correct this minor error. See *In re Marriage of Wendy W.*, 2022 IL App (1st) 201000, ¶ 5 (citing Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994), and *De Bouse v. Bayer*, 235 Ill. 2d 544, 556-67 (2009)) (not yet released for publication and subject to revision or withdrawal).

them under the same standards that govern the construction of statutes. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 380 (2008). "The fundamental objective of statutory construction is to ascertain and give effect to the intent of the legislature." *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 21. "The most reliable indicator of legislative intent is the statutory language, given its plain and ordinary meaning." *Id.* "A reasonable construction must be given to each word, clause, and sentence of a statute, and no term should be rendered superfluous." *Id.* " '[W]hen statutory language is plain and certain the court is not free to give it a different meaning.' " *Kalkman v. Nedved*, 2013 IL App (3d) 120800, ¶ 12 (quoting *In re Estate of Hoehn*, 234 Ill. App. 3d 627, 629 (1992)). "[A] court may not depart from the plain statutory language by reading into it exceptions, limitations, or conditions not expressed by the legislature." *Id.* ¶ 12 (citing *In re Estate of Ellis*, 236 Ill. 2d 45, 51 (2009)).

¶ 18       A. Illinois Administrative Code Title 89, Section 328.3(b)(1)

¶ 19    The first certified question concerns section 328.3 of Title 89 of the Illinois Administrative Code, which governs out-of-state placement of Illinois children. 89 Ill. Adm. Code 328.3 (1999). Section 328.3(b)(1) provides that, "prior to placing [DCFS] wards in other states, [DCFS] shall have determined that the applicable court of jurisdiction approves of the placement." 89 Ill. Adm. Code 328.3(b)(1) (1999). This language is straightforward: Before placing a child out-of-state, DCFS must obtain the relevant juvenile court's approval. It follows that, if the court does not approve the out-of-state placement, DCFS cannot make the placement. This section would be purely symbolic if the court could not enforce its disapproval of an out-of-state placement, so section 328.3(b)(1) must give juvenile courts the authority to reject out-of-state placements when DCFS requests approval. Moreover, this approval procedure requires the juvenile court to make a

best interest determination. Section 328.3(b)(1) references DCFS's "placement" of children, and a child's best interest takes precedence in determining placement. *In re Violetta B.*, 210 Ill. App. 3d 521, 533 (1991). Although the certified question discusses approval of a "move" rather than a "placement," we see no practical difference between these terms. An out-of-state placement of a child requires moving the child out of Illinois.

¶ 20    B.V. essentially argues that the approval process of section 328.3(b)(1) is a formality, and that a juvenile court cannot override DCFS's decision to place a child out-of-state. However, section 328.3(b)(1) uses the word "approves," which "connotes the exercise of discretion." *Veterans Assistance Comm'n v. County Board*, 274 Ill. App. 3d 32, 35 (1995). That is, the court does not simply rubber stamp DCFS's out-of-state placement decision. The court must exercise its judgment and either approve, and therefore allow, the placement or disapprove, and therefore disallow, the placement. This exercise of judgment must give precedence to the child's best interest (*In re Violetta B.*, 210 Ill. App. 3d at 533), so B.V.'s argument that the trial court erred by holding a best interest hearing on DCFS's motion is incorrect. Accordingly, we answer the first certified question in the affirmative, the trial judge has the authority to approve or reject DCFS placement decisions.

¶ 21                    B. Juvenile Court Act Section 2-28(2.5)

¶ 22    The second certified question concerns section 2-28(2.5) of the Juvenile Court Act . Section 2-28 sets forth the procedure for a juvenile court to review an abuse or neglect case through a series of permanency hearings. 705 ILCS 405/2-28 (West 2020). After a juvenile court has taken temporary custody of a child, it must hold a permanency hearing to "determine the future status of the child" by setting one of several permanency goals, which can include return home, termination

of parental rights, or adoption. *Id.* § 2-28(2).The court must hold permanency hearings at least every six months thereafter "until the court determines that the plan and goal have been achieved." *Id.* The court cannot order a specific placement (*id.*), but section 2-28(2.5) confers certain authority on both the court and DCFS at this stage (*id.* § 2-28(2.5)). The first portion of that section provides that:

> "If, after reviewing the evidence, including evidence from [DCFS], the court determines that the minor's current or planned placement is not necessary or appropriate to facilitate achievement of the permanency goal, the court shall put in writing the factual basis supporting its determination and enter specific findings based on the evidence. If the court finds that the minor's current or planned placement is not necessary or appropriate, the court may enter an order directing [DCFS] to implement a recommendation by the minor's treating clinician or a clinician contracted by [DCFS] to evaluate the minor or a recommendation made by [DCFS]." *Id.*

The second portion provides that:

> "If [DCFS] places a minor in a placement under an order entered under this subsection (2.5), [DCFS] has the authority to remove the minor from that placement when a change in circumstances necessitates the removal to protect the minor's health, safety, and best interest. If [DCFS] determines removal is necessary, [DCFS] shall notify the parties of the planned placement change in writing no later than 10 days prior to the implementation of its determination unless remaining in the placement poses an imminent risk of harm to the minor, in which case [DCFS] shall notify the parties of the placement change in writing

immediately following the implementation of its decision. [DCFS] shall notify others of the decision to change the minor's placement as required by [DCFS] rule." *Id.*

¶ 23    The first portion of section 2-28(2.5) addresses what happens when, following a permanency hearing, a juvenile court concludes that a child's current or planned placement is not necessary or appropriate. In that case, the court must issue a written factual basis for that determination and "enter specific findings based on the evidence." *Id.* In addition, the court can order DCFS to (1) implement a clinician's placement recommendation or (2) implement DCFS's own placement recommendation. *Id.* In either case, the placement recommendation must be different from the placement that the court rejected under section 2-28(2.5). Otherwise, this section would allow DCFS to proceed with a placement that the court has found to be unnecessary or inappropriate. So, the first portion of section 2-28(2.5) authorized the trial court to reject DCFS's planned placement of Q.P. with C.V. as unnecessary or inappropriate and to require DCFS to make a different placement recommended by a clinician or by DCFS itself.

¶ 24    The second portion of section 2-28(2.5) concerns what happens when DCFS "places a minor in a placement *under an order entered under this subsection (2.5)*." (Emphasis added.) *Id.* This portion grants DCFS certain authority when DCFS places a child *after* the court has rejected another placement pursuant to the first portion of section 2-28(2.5). In that case, DCFS may, under certain circumstances, change the child's new placement with notice to the parties, *i.e.*, without court involvement. Nevertheless, the court still must approve all out-of-state placements (89 Ill. Adm. Code 328.3(b)(1) (1999)), the court must continue to evaluate the child's placement at permanency hearings (705 ILCS 405/2-28(2) (West 2020)), and the court can reject future placements as unnecessary or inappropriate (*id.* § 2-28(2.5)). The second portion of section 2-

28(2.5) does not limit the court's power to reject placements; rather, it governs what DCFS can do after the court makes such a rejection and DCFS makes an alternative placement.

¶ 25    We have interpreted analogous language in section 2-28(2) the same way that we interpret section 2-28(2.5) in this case. Section 2-28(2) provides that:

> "If, after receiving evidence, the court determines that the *services* contained in the [permanency] plan are not reasonably calculated to facilitate achievement of the permanency goal, the court shall put in writing the factual basis supporting the determination and enter specific findings based on the evidence. The court also shall enter an order for the Department to develop and implement a new service plan or to implement changes to the current service plan consistent with the court's findings." (Emphasis added.) *Id*. § 2-28(2).

This language means that if the court is dissatisfied with the services in a permanency plan, the court "is required to make specific findings and to remand the matter to DCFS for its further consideration." *In re Chiara C.*, 279 Ill. App. 3d 761, 766 (1996); see also *In re T.L.C.*, 285 Ill. App. 3d 922, 929 (1996) (Juvenile Court Act allows "DCFS, operating under a plan, to make placement decisions with the safeguard being that the placements are subject to disapproval and required reconsideration by the circuit court"). Section 2-28(2.5) provides essentially the same thing in the context of placement, as opposed to services.

¶ 26    B.V. acknowledges that section "2-28(2.5) concerns a court's consideration of whether a placement is necessary or appropriate" based on "evidence during a permanency hearing," but she contends that a juvenile court has no statutory authority to deny a motion for out-of-state placement. Similarly, DCFS argues that section 2-28(2.5) does not apply to out-of-state placements

because section 328.3(b)(1) exclusively governs them. We disagree; these two sections are not mutually exclusive of each other. Section 328.3(b)(1) provides that DCFS must always seek court approval for an out-of-state placement before making the placement, regardless of the procedural posture of the juvenile court case. If DCFS seeks such approval during the permanency hearing stage, then section 2-28 applies. Section 2-28(2.5) applies to "current or planned placement[s]" and makes no distinction between in-state versus out-of-state placements. We cannot read this section as being limited to in-state placements. *Kalkman*, 2013 IL App (3d) 120800, ¶ 12. If the court rejects *any* placement, in-state or out-of-state, as inappropriate or unnecessary during the permanency hearing stage, then it must state its reasons for doing so in writing and may require a recommendation for alternative placement. 705 ILCS 405/2-28(2.5) (West 2020). These two sections work together to ensure that a juvenile court can review an out-of-state placement before it occurs and to ensure that the court makes a clear record of its reasons for rejecting such a placement.

¶ 27    B.V. cites *In re M.V.*, 288 Ill. App. 3d 300, 305 (1997) for the proposition that a juvenile court "has no statutory authority to designate a specific placement or foster home." We agree. However, *M.V.* does not answer the second certified question. That question asks whether a juvenile court can find that a planned out-of-state placement is *not* necessary, appropriate, or in the child's best interest and therefore prevent the placement. The answer to that question is yes, and the statutory authority for it is section 2-28(2.5) of the Juvenile Court Act.

¶ 28    B.V. also argues that, even if the trial court properly conducted a permanency hearing in deciding the motion for out-of-state placement, "the only available remedy was to order DCFS to implement a clinical recommendation," which was to place Q.P. in Arizona because that is what

DCFS's clinical staffing recommended. B.V.'s interpretation is too narrow. As explained above, when a court finds that a planned placement is unnecessary or inappropriate, the court may order DCFS to make an alternative placement based on a clinician's recommendation or based on DCFS's own recommendation. Whichever path the court chooses, it would be illogical to allow DCFS to proceed with a placement that the court has found to be unnecessary or inappropriate. Accordingly, we answer the second certified question in the affirmative, the trial court has the authority under the Juvenile Court Act (705 ILCS 405/2-28(2.5) (West 2020)) to find it is not in the best interest of a child to move out-of-state because the court determines that the child's planned placement is not necessary or appropriate.

¶ 29                    C. Procedural Requirements of Section 2-28(2.5)

¶ 30    Finally, B.V. maintains that the trial court made procedural and factual errors in denying DCFS's motion for out-of-state placement. The merits of the trial court's ruling are not among the certified questions. However, once we answer the certified questions, "in the interests of judicial economy and the need to reach an equitable result, we may consider the propriety of the circuit court order that gave rise to these proceedings." *In re Marriage of Dahm-Schell*, 2021 IL 126802, ¶ 31.

¶ 31    B.V. is the only appellant in this case, so first we examine whether she has standing to challenge the denial of DCFS's motion for out-of-state placement. B.V., as the biological mother of Q.P., has standing to present arguments that assure Q.P.'s placement serves his best interest. *In re Al. S.*, 2017 IL App (4th) 160737, ¶ 37. B.V.'s argument that the court's placement decision is against the manifest weight of the evidence presents an actual controversy having a direct and substantial impact on the ultimate determination of whether Q.P.'s placement serves his best

interest. See *id.* So B.V. has standing to contest the trial court's decision to prevent DCFS from placing Q.P. with his aunt in Arizona. DCFS's motion sought a change of placement from S.K.-M. and A.M.'s home in Illinois to C.V.'s home in Arizona. A motion for a change of placement can be construed as a permanency review hearing under section 2-28. *In re Chiara C.*, 279 Ill. App. 3d at 766; see also *In re M.P.*, 401 Ill. App. 3d 742, 747 (2001); *In re A.L.*, 294 Ill. App. 3d 441, 446 (1998).

¶ 32     We agree with B.V. that the trial court made a procedural error in denying DCFS's motion for an out-of-state placement. We therefore reverse the trial court's denial of DCFS's motion because the court did not comply with the requirements of section 2-28(2.5). When a court rejects a planned placement as unnecessary or inappropriate, it "*shall* put in writing the factual basis supporting its determination and enter specific findings based on the evidence." (Emphasis added.) 705 ILCS 405/2-28(2.5) (West 2020). The word "shall" is " 'a clear expression of legislative intent to impose a mandatory obligation,' and the trial court was not free to ignore this mandate." *In re T.S.*, 402 Ill. App. 3d 1159, 1171-72 (2010) (quoting *People v. O'Brien*, 197 Ill. 2d 88, 93 (2001)). The trial court entered an order that denied the motion for out-of-state placement and stated, "See transcript of [p]roceedings." That is, the court did not put in writing the factual basis supporting its denial of DCFS's motion. This approach was insufficient because the reports of proceedings in the record span more than 350 pages and approximately 14 different hearings. In addition, the court's order does not indicate whether or how it evaluated more than 200 pages of exhibits submitted by the parties, including the academic studies that the court specifically requested. Even if the court's oral ruling was sufficient to comply with section 2-28(2.5), that ruling did not address the exhibits either, and it provided only a generalized summary of witness testimony, not the

specific findings that the Act requires. On remand, the trial court is directed to comply with section 2-28(2.5) of the Juvenile Court Act. See *id.* at 1172.

¶ 33                                    III. CONCLUSION

¶ 34    For the foregoing reasons, we answer both certified questions in the affirmative. However, we reverse the trial court's denial of DCFS's motion for out-of-state placement as noncompliant with the procedural requirements of section 2-28(2.5).

¶ 35    Reversed and remanded; certified questions answered.

*In re Q.P.*, 2022 IL App (1st) 220354

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-JA-1227; the Hon. Patrick T. Murphy, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Alexander Stein, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, and Kimberly M. Foxx, State's Attorney, both of Chicago (David E. Neumeister, Assistant Attorney General, and Enrique Abraham, Gina DiVito, and Ashlee Cuza, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, Jeffrey Sterbenc, and Carrie Fung, of counsel), guardian *ad litem*. |