NOTICE

Decision filed 07/18/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230131-U

NOS. 5-23-0131, 5-23-0132, 5-23-0133 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* C.S., L.S., and A.S., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 22-JA-84, 22-JA-85, |
| | ) | 22-JA-86 |
| | ) | |
| Jesse S., | ) | Honorable |
| | ) | Robert E. McIntire, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's dispositional order finding the minor children neglected was not against the manifest weight of the evidence. Moreover, the court did not err by placing guardianship with Christine and James K.

¶ 2    This appeal arises from the dispositional order of the circuit court of Vermilion County finding C.S. (22-JA-84), L.S. (22-JA-85), and A.S. (22-JA-86) neglected.[1] Respondent-father filed a timely notice of appeal in each case, and the cases were consolidated for our review. We affirm.

_____

[1]The records in each consolidated case are nearly identical. For purposes of this order, any factual information derives from the record in 22-JA-84.

1

¶ 3                                    I. Background

¶ 4      We limit our recitation of the facts to those necessary for an adequate understanding of the case and resolution of the issue presented before us on appeal. We will recite additional facts in the analysis section as needed to address respondent-father's specific arguments.

¶ 5      On July 8, 2022, the State filed a petition for adjudication of wardship regarding all three children. The petition alleged four counts of neglect. Count I alleged neglect pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)), in that the minors' environment was injurious to their welfare due to mother's substance abuse.[2] Count II alleged the same due to respondent-father's substance abuse. Count III alleged neglect pursuant to section 2-3(1)(b) of the Act, in that the environment was injurious to the minors' welfare where the parents engaged in domestic violence in front of the minors, placing them in physical and emotional danger of harm. The final count alleged neglect pursuant to section 2-3(1)(a) of the Act (*id.* § 2-3(1)(a)), in that the parents failed to provide the proper and necessary support, education, or other remedial care required for the minors' welfare.

¶ 6      On July 8, 2022, the circuit court held a shelter care hearing. The State presented the testimony of Department of Children and Family Services (DCFS) caseworker Jamie Russell. Russell testified that he was the investigator appointed to the case, and an initial report regarding the minor children came in on June 2, 2022. According to the report, a domestic altercation occurred between respondent-father and the mother in front of the children, where respondent-father allegedly punched mother in the nose while riding in a vehicle.

¶ 7      A second report came on June 3, 2022. The second report raised concerns about the children lacking housing and food, and also indicated that the family was kicked out of a hotel

---

[2]Mother is not a party to the instant appeal. Mother pursued her own appeal in No. 5-23-0128.

with nowhere to go. According to the report, the children "were filthy" and lacking hygiene. The investigator on call, Meredith Brooks, facilitated the family to stay in a hotel and move to a shelter. However, mother left the hotel and stopped responding to investigators.

¶ 8 A third and final report came on June 30, 2022. According to the report, a second domestic violence incident occurred between respondent-father and mother, wherein respondent-father battered mother and was arrested. The children were present during the altercation. Russell met with mother, who confirmed the domestic dispute. Russell testified that there were concerns regarding methamphetamine use by both respondent-father and mother.

¶ 9 Russell testified that he consulted with the state's attorney's office, and they created a plan to allow the children to return to their former foster family, James and Christine K., in Veedersburg, Indiana. Russell took protective custody of the children on July 6, 2022. Russell noted that when protective custody was taken, C.S. was "clean," but "the other two children were very dirty." C.S. advised Russell that there were domestic disputes wherein respondent-father hit mother. C.S. advised Russell that "his dad made money by making chemicals out at the home of Tara Ray." Russell testified that the parents had "very little" clothing for the children. A.S. did not have pants. Russell testified that the parents had previous DCFS involvement, wherein the children were previously in protective custody. Both respondent-father and mother had prior arrests for methamphetamine use.

¶ 10 Russell additionally testified that, at the time of the shelter care hearing, the children were placed in three separate homes. The preference of DCFS was to keep the children together in their prior foster placement in Indiana. Russell requested that temporary custody of all three children be granted to the K. family in Indiana, who cared for them during their prior protective care.

3

¶ 11    The circuit court granted protective custody and placed temporary custody with the K. family. The court noted that although it was an "unusual situation" placing the children outside of the state, the court found it "important" to keep the children together and to provide "continuity with people that they have known from the past." On August 30, 2022, DCFS filed a family service plan with the court. The service plan indicated that the children were previously in care in Vermilion County dockets 2018-JA-31-33. The service plan indicated that mother remained with respondent-father, despite the allegations of domestic abuse. As to father, the service plan indicated that the K. family acquired an order of protection against father, where father threatened the K. family. Father had charges pending in Vermilion County for domestic battery. Father also had a lengthy criminal history, including trespass to residence, disorderly conduct, dangerous drugs, invasion of privacy, larceny, obstruction, and public peace. The service plan recommended a goal of adoption, where the children resided with a family that was willing to provide permanency for them.

¶ 12    On November 10, 2022, the circuit court held an adjudicatory hearing. Roosevelt Fuentes, a probation officer for Vermilion County, testified. Fuentes facilitated drug drops for respondent-father and mother. On September 2, 2022, Fuentes was asked to do a drug drop for respondent-father. As Fuentes walked respondent-father to do the drop, respondent-father took a "left down the stairs and ended up leaving the courthouse." Tara Woodard, another probation officer, was with Fuentes during this incident. Woodward facilitated a drug drop for mother. Mother also left the courthouse and ignored Woodard and Fuentes. Neither parent complied with a drug drop on September 2, 2022, as ordered by the court.

¶ 13    Kaitlyn Swisher, an officer with the Danville Police Department, testified. On June 1, 2022, Swisher was dispatched to the Candle Lite Motel in Danville for a domestic disturbance. Upon

arrival, Swisher observed mother, who had swelling and bruising to her nose, and three juveniles. Mother told Swisher that she could not find respondent-father, so she went looking for him. Mother found respondent-father's truck south of Rossville, where he was with another woman. Mother's vehicle subsequently got stuck, with all three children inside. Mother called respondent-father to come pick them up. Respondent-father came to pick them up, and mother and respondent-father began to argue. Mother acknowledged that she "hit" respondent-father "in the right side of his face" and respondent-father then "back handed her into the nose, causing the bruising and swelling." The three children were in the vehicle at that time. Swisher observed mother's injuries.

¶ 14    Scott Showers, an officer with the Danville Police Department, testified. Showers testified that on June 30, 2022, he was dispatched to the Candle Lite Motel for a domestic dispute. Showers went to the motel room door, and mother opened the door. Respondent-father was present in the room wearing only a towel. Mother advised Showers that she and respondent-father had a verbal argument which turned physical. Mother advised Showers that respondent-father "hit her multiple times with open and closed hands, and then also spit on her." Showers observed spit in mother's hair and visible marks on her face. Showers testified that all three children were present in the hotel room. Showers placed respondent-father under arrest for domestic battery. Showers contacted DCFS.

¶ 15    Russell also testified consistently with his shelter care hearing testimony. Meredith Brooks testified. Brooks was the investigator on the second report on June 3, 2022. Brooks received a hotline call that mother and the children were kicked out of their motel with nowhere to go, and the children were "filthy," with matted hair, and smelled of urine. The hotline caller advised that mother was "yelling about not having any money, and that they were hungry." Brooks contacted mother the next day. Brooks observed that mother had a black eye. Brooks attempted, without

luck, to secure mother and the children a space in a shelter. Brooks assisted mother in staying at a hotel for the weekend.

¶ 16 Brooks checked on mother the next day and took pizza for the children. Mother advised Brooks that she and respondent-father "reconciled" and he "stopped by," "gave her back her phone," and "put some money on her cash app."

¶ 17 Following argument from the parties, the circuit court found all three children neglected, wherein each is "in an environment injurious to their welfare." The court based this finding upon the "multiple instances of domestic violence between the parents in the presence of the children, as well as the failure to provide necessary support, or other remedial care for the children's welfare." Thus, the court found the State proved, by a preponderance of the evidence, counts III and IV of the petitions for each child. The court did, however, find the State failed to prove counts I and II.

¶ 18 Following the hearing, mother and respondent-father submitted drug drops. Mother's results were negative. Respondent-father was positive for THC.

¶ 19 On December 30, 2022, DCFS filed a dispositional hearing report with the circuit court. The dispositional hearing report indicated that respondent-father was not cooperative with DCFS regarding services. The report noted that respondent-father did not have a stable home and frequently lived in Indiana. Respondent-father did not gain employment. The report indicated, however, that he was responsive to phone calls and text messages, and he maintained regular contact with caseworkers.

¶ 20 Respondent-father failed drug drops on October 4, 2022, October 7, 2022, and October 18, 2022 (positive for THC). For the remainder of the screenings, respondent-father seemingly failed to test. Respondent-father did not complete substance abuse assessments. Respondent-father

received a referral for domestic violence services which did not begin until after the filing of the dispositional hearing report.

¶ 21 The report noted numerous police reports for domestic disturbances which occurred on October 4, 2021, October 18, 2021, October 24, 2021, February 26, 2021, June 1, 2021, and March 30, 2021. The report additionally noted that both parents had an extensive prior indicated history with the children, who previously were in care.

¶ 22 On February 22, 2023, DCFS filed a dispositional hearing report with the circuit court. The report indicated that both parents took steps to initiate the partner abuse intervention program. However, the parents did not particulate in substance abuse programming. Neither parent participated in random drug drops, specifically failing to attend six requests to complete drops. Neither parent met with their caseworker on a weekly basis as required. The report indicated that respondent-father and mother were homeless and living in a motel on DCFS funds.

¶ 23 The service plan filed with the dispositional hearing report indicated that respondent-father was unsatisfactory for completing substance abuse assessments and completing random drug drops. Respondent-father was also unsatisfactory where he missed scheduled meetings with his caseworker or left them early due to anger and frustration.

¶ 24 On February 23, 2023, the circuit court held a dispositional hearing. Christine K., the temporary custodian of the children, testified. Christine testified that she and her husband lived in Indiana. If DCFS was awarded guardianship, the children would be removed from her home in Indiana to be placed in Illinois. Christine testified that the children have a long and documented history of instability, and she provides them with a stable home environment. Christine constituted a family placement, where the father of the children is her nephew.

¶ 25    Christine testified that the children received therapy services to work through their trauma. Christine testified that the children received appropriate mental health services in her care. Christine testified that the children were in her care from June or July of 2019 until May of 2020. At that time, an interstate compact[3] was done to place the children with her.

¶ 26    C.S. attended school where he did well "grade-wise." C.S. exhibited emotional outbursts where "he would hit himself in the face, on his body, scratch, [and] scream." His care team including Christine, therapists, and teachers "are working with that." A.S. advised Christine that "mommy would hit her." A.S. attended therapy for behaviors such as hitting herself. L.S. attended play-based therapy.

¶ 27    Christine testified that she and her husband were financially able to take care of the children without a DCFS subsidy. Both Christine and her husband had stable employment.

¶ 28    Next, James K. testified. James is Christine's husband. James testified that his wife's testimony was accurate, and that he was willing and able to serve as guardian for the children.

¶ 29    On March 2, 2023, the circuit court continued the dispositional hearing. Respondent-father testified that he "was denied visitation" with the children. He testified that he had no contact with the children since they went into care. Respondent-father testified that he was willing to complete services in order to "get them back." Respondent-father testified that he did not have a residence and "bounced around." Respondent-father testified that there was never physical violence in the home. Respondent-father suggested that he had family in Illinois that would be suitable foster parents for the children. He testified that he had siblings that "would help out."

---

[3]"Interstate compact" refers to the Interstate Compact on Placement of Children Act, which facilitates cooperation between states for the interstate placement of children. 45 ILCS 15/0.01 *et seq.* (West 2020).

¶ 30    After considering the evidence, the circuit court found both parents unfit and unable to care for the children. Considering the best interests of the children, the court found that it was "not in the best interest of these children" to "take them away from the placement that they've been in for frankly a pretty decent part of their lives, quite possibly have them split up." The court noted that if DCFS took custody of the children, there was "a possibility, though that's not crucial to my decision, but there is a possibility that [C.S.] would have to go to a specialized foster home, and the other two to a regular one." The court noted that such a result might not be a "good path to permanency" for the children. The court noted that the children were "in a home that is able to address their needs, where they, I think, feel safe and stable." Thus, the court determined that it would be "immensely disruptive for these children in this particular instance to remove them from their current temporary guardians" and place them with DCFS. As such, the court granted the request to place all three children with the foster parents, Christine and James K.

¶ 31    The circuit court noted that it did not terminate parental rights. Although the parents lost custody and guardianship, they "still have residual parental rights." The court encouraged the parents to seek services for substance abuse and domestic violence.

¶ 32    The same day, the circuit court entered a dispositional order. Specifically, the court noted that it was not consistent with the health, welfare, and safety of the children nor in their best interests to be made minor wards of the court. The court found both mother and respondent-father unfit and unable to care for the children. Specifically, to respondent-father, the court found him unfit, unable, and unwilling, where respondent-father demonstrated a "need to evidence sobriety, complete substance abuse treatment, domestic violence education, parenting education, and establish and maintain a safe and appropriate home for the children." The court placed custody and guardianship with James and Christine K.

9

¶ 33    The circuit court entered an order to close the proceedings, where legal custody and guardianship was granted to Christine and James K., who lived in Indiana.

¶ 34    This appeal followed.

¶ 35                                 II. Analysis

¶ 36    Respondent-father argues that the circuit court erred by finding the children neglected and granting their permanent custody and guardianship to James and Christine K.[4] For the following reasons, we affirm.

¶ 37                          A. Finding of Neglect

¶ 38    First, respondent-father argues that the circuit court erred by finding C.S., L.S., and A.S. neglected children. For the reasons that follow, we disagree.

¶ 39    The Act (705 ILCS 405/1-1 *et seq.* (West 2020)) establishes a two-step process for determining whether a child should be removed from his or her parents' custody and made a ward of the court. *In re D.A.*, 2022 IL App (2d) 210676, ¶ 13. First, the trial court holds an adjudicatory hearing to determine whether the minor is abused, neglected, or dependent. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004); 705 ILCS 405/2-21(1) (West 2020). If the court determines that the minor is abused, neglected, or dependent, it holds a dispositional hearing to determine whether it is in the best interests of the minor and the public for the minor to become a ward of the court. *In re D.A.*, 2022 IL App (2d) 210676, ¶ 13; 705 ILCS 405/2-21(2) (West 2020).

¶ 40    Section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2020)) defines a neglected minor to include any minor under 18 years of age whose environment is injurious to his or her

_____

[4]We note that the notice of appeal in this case indicated respondent-father was appealing only the dispositional order. However, an adjudicatory order is generally not considered a final appealable order and is a step in the procedural progression leading the to the dispositional order. *In re Ay. D.*, 2020 IL App (3d) 200056, ¶ 37. Accordingly, the dispositional order—which is a final judgment appealable as of right—is the proper vehicle to appeal a finding of abuse or neglect. *Id.*

welfare. Neglect based on an "injurious environment" is not readily susceptible to definition. *In re J.P.*, 331 Ill. App. 3d 220, 234 (2002). However, neglect has generally been described as the failure to exercise the care that circumstances justly demand and encompasses willful and unintentional disregard of parental duty. *Id*. at 235. Cases involving the adjudication of neglect and wardship are *sui generis*, and each case must ultimately be decided on the basis of its own particular facts. *In re Edricka C.*, 276 Ill. App. 3d 18, 25 (1995).

¶ 41 The State has the burden of proving by a preponderance of the evidence that the child is abused, neglected, or dependent. *In re D.A.*, 2022 IL App (2d) 210676, ¶ 13. A preponderance of the evidence is the amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not. *In re J.P.*, 331 Ill. App. 3d at 234. A trial court's determination of neglect based on an injurious environment will not be reversed unless it is against the manifest weight of the evidence. *In re D.A.*, 2022 IL App (2d) 210676, ¶ 14. A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the presented evidence. *Id*.

¶ 42 In the case before us, the circuit court considered significant evidence to support its finding of neglect. At the November 10, 2022, adjudicatory hearing, Swisher, an officer with the Danville Police Department, testified. Swisher was dispatched to the Candle Lite Motel in Danville for a domestic disturbance. Upon arrival, Swisher observed mother, who had swelling and bruising to her nose, with three juveniles. Mother advised Swisher that she and respondent-father had a domestic dispute, and the three children were in the vehicle at that time. Swisher observed mother's injuries.

¶ 43 Additionally, Showers, an officer with the Danville Police Department, testified. Showers testified that on June 30, 2022, he was dispatched to the Candle Lite Motel for a domestic dispute.

11

Showers went to the motel room door, and mother opened the door. Respondent-father was present in the room wearing only a towel. Mother advised Showers that she and respondent-father had a verbal argument which turned physical. Mother advised Showers that respondent-father "hit her multiple times with open and closed hands, and then also spit on her." Showers observed spit in mother's hair and visible marks on her face. Showers testified that all three children were present in the motel room. Showers placed respondent-father under arrest for domestic battery. Showers contacted DCFS.

¶ 44    The circuit court heard testimony from Brooks, the investigator on the second report on June 3, 2022. Brooks received a hotline call that mother and the children were kicked out of their motel, had nowhere to go, and the children were "filthy," with matted hair, and smelled of urine. The hotline caller advised that mother was "yelling about not having any money, and that they were hungry." Brooks contacted mother the next day. Brooks observed that mother had a black eye. Brooks attempted with no luck to secure mother and the children a space in a shelter. Brooks assisted mother in staying at a hotel for the weekend.

¶ 45    Brooks checked on mother the next day and took pizza for the children. Mother advised Brooks that she and respondent-father "reconciled" and he "stopped by," "gave her back her phone," and "put some money on her cash app." Brooks advised mother that she still needed to come talk with her on Monday. Following the visit, mother dropped contact with Brooks altogether.

¶ 46    Following argument from the parties, the circuit court found all three children neglected "in an environment injurious to their welfare." The court based this finding upon the "multiple instances of domestic violence between the parents in the presence of the children, as well as the failure to provide necessary support, or other remedial care for the children's welfare." Thus, the

12

court found the State proved, by a preponderance of the evidence, counts III and IV of the petitions for each child. Considering the totality of this evidence, we find that the circuit court's finding of neglect based on an injurious environment was not against the manifest weight of the evidence. As such, we find no error with the circuit court's order adjudicating the minors neglected.

¶ 47                                    B. Unfitness

¶ 48    Next, although respondent-father does not explicitly raise an argument regarding the circuit court's dispositional "unfit" finding, we construe his brief to raise the issue and consider whether the finding of dispositional "unfit" was supported by the record.

¶ 49    The proceedings in this matter are governed by the Act (705 ILCS 405/1-1 *et seq.* (West 2020)), which provides a systematic framework for determining when a minor child may be removed from his or her parents and made a ward of the State. *In re A.P.*, 2012 IL 113875, ¶ 18. First, the circuit court must make a finding of abuse, neglect, or dependence regarding the child. 705 ILCS 405/2-21 (West 2020). If the circuit court finds a child is neglected, then the circuit court conducts a dispositional hearing at which the "court shall determine whether it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." *Id*. § 2-21(2). When a minor is made a ward of the court, the circuit court must also determine the proper disposition that best serves the health, safety, and interest of the minor child and the public. *Id.* § 2-22. A proper disposition may include the removal of the minor child from the custody of his or her parent if the court determines that the parent is unfit, unable, or unwilling, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor child, and that the health, safety, and best interest of the minor would be jeopardized if the minor child remained in the custody of his or her parent. *Id.* §§ 2-23, 2-27.

¶ 50    "[A] proceeding seeking to divest a parent of custody and guardianship following a finding of abuse or neglect and a proceeding seeking the termination of parental rights *** are different, and the stringency of the requisite 'unfitness' as it relates to each proceeding is also different." *In re A.R.*, 2022 IL App (3d) 210346, ¶ 17. Where the State is not seeking to terminate the parental rights of a respondent, "the State need only prove respondent unfit under the ordinary meaning of that term." *Id.*

¶ 51    A circuit court's finding at a dispositional hearing will only be reversed if the findings of fact are against the manifest weight of the evidence or the circuit court committed an abuse of discretion by selecting an inappropriate dispositional order. *In re J.W.*, 386 Ill. App. 3d 847, 856 (2008). A circuit court's finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident or where its finding is unreasonable, arbitrary, or not based on the evidence presented. *In re Al. S.*, 2017 IL App (4th) 160737, ¶ 41. Further, wide discretion is vested in the circuit court judge to an even greater degree in child custody cases than any ordinary appeal to which the familiar manifest weight principle is applied. *In re Martin*, 31 Ill. App. 3d 288, 293 (1975).

¶ 52    In the case before us, the circuit court considered evidence which demonstrated that respondent-father engaged in numerous instances of domestic violence in front of the children throughout the pendency of the proceedings. Specifically, caseworker Russell testified that an initial report came on June 2, 2022, alleging that a domestic altercation occurred between respondent-father and mother in front of the children, where respondent-father allegedly punched mother in the nose while riding in a vehicle. Russell also testified that on June 30, 2022, a domestic violence incident occurred between respondent-father and mother, where respondent-father battered mother and was arrested. The children were present during the altercation. Respondent-

14

father had charges pending in Vermilion County for domestic battery against mother regarding this situation. Russell indicated concerns regarding methamphetamine use by both respondent-father and mother, who both had previous arrests for methamphetamine use.

¶ 53 The circuit court heard evidence related to respondent-father's criminal history. Specifically, a DCFS service plan indicated that the K. family acquired an order of protection against respondent-father after he threatened them. Respondent-father also had a lengthy criminal history, including trespass to residence, disorderly conduct, dangerous drugs, invasion of privacy, larceny, obstruction, and public peace.

¶ 54 Additionally, respondent-father was unsatisfactory for attending drug drops or testing clean. Following the adjudicatory hearing, respondent-father tested positive for THC. Respondent-father failed drug drops on October 4, 2022, October 7, 2022, and October 18, 2022 (positive for THC), and for the remainder of the screenings, respondent-father seemingly failed to submit to testing. Moreover, the dispositional hearing report indicated that respondent-father was not cooperative with DCFS regarding services, including substance abuse assessments and scheduled meetings with his caseworker. When respondent-father met with his caseworker, he often left early due to anger and frustration. The report noted that respondent-father did not have a stable home but stayed in a motel with DCFS funds, and he frequently lived in Indiana. Respondent-father did not gain employment.

¶ 55 Based on this evidence, the circuit court entered a dispositional order finding the children neglected. The court found respondent-father unfit, unable, and unwilling, where respondent-father demonstrated a "need to evidence sobriety, complete substance abuse treatment, domestic violence education, parenting education, and establish and maintain a safe and appropriate home

for the children." This evidence was more than sufficient for the circuit court to find C.S., L.S., and A.S. neglected children.

¶ 56 Therefore, the circuit court's finding that that the children were neglected, where the evidence demonstrated that respondent-father was unable and unfit to care for the three minor children, was not against the manifest weight of the evidence.

¶ 57                                C. Guardianship Order

¶ 58 Second, respondent-father argues that the circuit court erred by granting custody and guardianship to James and Christine K. Specifically, respondent-father contends that custody and guardianship should have been placed with DCFS. The State responds that it is in the children's best interest that they stay in the custody of James and Christine K. For the reasons that follow, we agree with the State.

¶ 59 "This court must exercise its judgment and either approve, and therefore allow, the placement or disapprove, and therefore disallow, the placement" of the children with an out-of-state family. *In re Q.P.*, 2022 IL App (1st) 220354, ¶ 20. "This exercise of judgment must give precedence to the child's best interest ***." *Id*. When determining the child's best interests, the circuit court is required to consider, in the context of the child's age and developmental needs, the following:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:

16

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2020).

¶ 60  "While all of the above-cited factors must be considered, no factor is dispositive." *In re Austin W.*, 214 Ill. 2d 31, 50 (2005). Other important factors include " 'the nature and length of the child's relationship with the present caretaker' and the effect that a change of placement would have upon the emotional and psychological well-being of the child." *Id.* (quoting *In re Violetta B.*, 210 Ill. App. 3d 521, 534 (1991)). The circuit court is not required to articulate any specific rationale for its decision, and on review we may affirm the circuit court's decision without relying on any basis used by the circuit court. *In re Tiffany M.*, 353 Ill. App. 3d 883, 893 (2004).

17

¶ 61 As an initial matter, we note that respondent-father contends that there "were relative placement options in Illinois that would provide a familiar home for the children." At the dispositional hearing, father testified that he had "several" relatives in Illinois. Specifically, respondent-father testified as follows:

"I believe any my siblings would—if they were approached within the idea that would work between all of them, I believe my siblings would help out. My sister, Miranda, in particular, has helped before. I don't think that she—not on a permanent basis. She would play her role as a family member and step up where needed. So long as I'm doing what I need to do to be moving in the right direction, yes, I believe my family would assist in, you know, providing care for the kids."

Respondent-father continued:

"They were with my sister, Miranda, but I also believe even my brothers, I believe my brother, Joe, and my brother, Allen, would also help out with the boys."

¶ 62 The State notes that respondent-father's testimony regarding family placement in Illinois was "filled with qualifiers and contingencies." We agree.

¶ 63 Here, the testimony established that the K. family attended to the physical safety and welfare of the children, including providing them with food, shelter, health, and clothing. The evidence demonstrated that the K. family aided in the development of the children by ensuring their mental health was addressed through therapy services. Additionally, as the paternal great-aunt of the children, Christine K. is able to foster the children's background and ties, including familial, cultural, and religious. Moreover, the three children remained together in the K. home. The children attended school, with the youngest child beginning in the fall, and C.S. received good grades. The evidence established that the children felt love and attachment from Christine and James K. The K. home was familiar to the children, where their initial DCFS placement in a prior case resulted in foster placement with the K. family. As such, continued placement with them was

18

the least disruptive placement, particularly where, as the circuit court noted, placement in Illinois could result in the children being split among foster homes.

¶ 64    Given all circumstances in the present case, we cannot conclude that the circuit court erred by placing guardianship with Christine and James K.

¶ 65                              III. Conclusion

¶ 66    For the reasons stated, we affirm the judgment of the circuit court.


¶ 67    Affirmed.